# EXHIBIT A

# EXHIBIT A

SULLIVAN, HILL, LEWIN, REZ & ENGEL
A Professional Law Corporation
Timothy C. Earl, SBN 174967
Catherine A. Hanna-Blentzas, SBN 253812
550 West "C" Street, Suite 1500
San Diego, California 92101
Telephone:  (619) 233-4100
Fax Number: (619) 231-4372

Attorneys for Plaintiff, MORENA VISTA, LLC

FILED
CIVIL BUSINESS OFFICE 17
CENTRAL DIVISION

14 JUL 11  PM 3: 04

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

F I L E D
Clerk of the Superior Court
JUL 1 1 2014

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO – CENTRAL DIVISION

| | |
|---|---|
| MORENA VISTA, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, a Pennsylvania corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 37-2014-00023031-CU-IC-CTL<br><br>**VERIFIED COMPLAINT FOR:**<br><br>(1)  **BREACH OF CONTRACT (DUTY TO INDEMNIFY);**<br>(2)  **DECLARATORY RELIEF;**<br>(3)  **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (DUTY TO SETTLE);**<br>(4)  **UNLAWFUL BUSINESS PRACTICES;**<br>(5)  **RECOVERY OF JUDGMENT; AND**<br>(6)  **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (FAILURE TO PAY JUDGMENT)** |

Plaintiff, MORENA VISTA, LLC ("MORENA VISTA"), a California limited liability company, alleges:

## PARTIES

1.     At all times relevant herein, Plaintiff MORENA VISTA, LLC ("MORENA VISTA") is and was a California limited liability company authorized to do business and doing business within the State of California, including, but not limited to, the County of San Diego.

2.     MORENA VISTA is informed and believes and thereon alleges that at all times

1

1  relevant herein, Defendant THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

2  ("ICSOP") was and is a Pennsylvania corporation and a surplus lines insurer which has obtained

3  authorization from the California Department of Insurance to issue insurance policies in the State of

4  California to residents and business entities in California.  MORENA VISTA is further informed and

5  believes and thereon alleges that ICSOP utilizes the services of a managing general agent and excess

6  and/or surplus lines brokers, who each have authority to bind coverage in California on behalf of

7  ICSOP.

8        3.     Morena Vista is informed and believes and thereon alleges that DOES 1 through 50,

9  inclusive and each of them, whether individuals, corporations, partnerships, or otherwise, are

10  fictitious names of Defendants who provided excess commercial general liability ("CGL") insurance

11  to MORENA VISTA but whose true names are, at this time, unknown to MORENA VISTA.

12  MORENA VISTA is informed and believes and thereon alleges that DOES 1 through 50, inclusive,

13  and each of them, are liable for the acts and/or omissions hereinafter alleged, including the issuance

14  of insurance policies affording coverage to MORENA VISTA.  A reference to Defendants herein

15  includes the DOE Defendants.  At such time as Defendants' true names become known to MORENA

16  VISTA, MORENA VISTA will ask leave of this Court to amend this Complaint to insert said true

17  names.

18        4.     MORENA VISTA is informed and believes and thereon alleges that ICSOP and

19  Defendants DOES 1 through 50, inclusive, and each of them, were and are agents, servants,

20  venturers, partners, representatives, employees, co-insurers, co-conspirators, and/or members of the

21  other Defendants identified herein, and each of them, and were acting with the full knowledge,

22  consent, permission, and ratification of each of their co-Defendants with respect to the denial of

23  insurance policy benefits owed to MORENA VISTA.

24                        **VENUE AND JURISDICTION**

25        5.     MORENA VISTA is informed and believes and thereon alleges that at all times

26  relevant to the disputes referenced in this Complaint, ICSOP and Defendants DOES 1 through 50,

27  inclusive, and each of them, were doing business in the County of San Diego, State of California.  In

28  particular, ICSOP and Defendants DOES 1 through 50, inclusive, and each of them, issued excess

1    CGL insurance policies to owners, including MORENA VISTA, in the County of San Diego wherein

2    MORENA VISTA was and is doing business.  MORENA VISTA contends that ICSOP and DOES 1

3    through 50, inclusive, and each of them, entered into a contractual relationships with MORENA

4    VISTA in the County of San Diego, State of California, by issuing policies of insurance to

5    MORENA VISTA therein.

6         6.     MORENA VISTA is doing business in the City of San Diego within the County of

7    San Diego, State of California, and is involved in the business of performing residential real estate

8    development services for, among other things, mixed-use developments including but not limited

9    apartment buildings and retail units along with common areas appurtenant thereto.  MORENA

10   VISTA contends that its alleged contractual obligations and construction work performed pursuant

11   thereto which are the subject of the underlying construction defect arbitration action at issue were

12   entered into and/or occurred in the County of San Diego, State of California.

13                          **THE UNDERLYING ACTION**

14        7.     On or about September 1, 2004, MORENA VISTA entered into a written agreement

15   entitled "Design-Build Agreement On Site and General Conditions" (the "Contract") with Legacy

16   Building Services, Inc. ("Legacy") to design and construct the mixed-use development commonly

17   referred to as The Village at Morena Vista located at 5175 Linda Vista Road and 5375 & 5395 Napa

18   Street in San Diego consisting of 3 buildings with 163 apartments, 22 lofts, and 18,814 sq. ft. of net

19   leasable retail space.  Buildings A and B are three-story wood and steel framed structures with

20   commercial space on the first floor and 22 loft-style apartments with exterior balconies on the

21   second and third floors.  Building C is a four-story wood framed structure surrounding a central

22   courtyard plaza, which includes concrete paving, planters and a raised pool and spa.  Common

23   amenities are located on the first floor, including the leasing center, business center, theater room,

24   game room, fitness facility and guest kitchen facilities, with 163 residential apartment units

25   occupying the remaining floors.  Building C is located above a one-level subterranean parking

26   garage.  (Buildings A, B & C are collectively referred to herein as "the Project.")

27        8.     On or about September 22, 2011, MORENA VISTA filed a Demand for Arbitration

28   with Judicial Arbitration and Mediation Services, Inc. entitled *Morena Vista, LLC v. Legacy Building*

                              3

*Services, Inc.*, JAMS Reference No. 1240020571 (hereinafter the "Underlying Action"). The Underlying Action includes claims for breach of contract, breach of express warranties, breach of implied warranties, and negligence arising from damages associated with Legacy's construction of the Project. Therein, MORENA VISTA alleged, among other things:

> 11.    MV is informed and believes and thereon alleges that the latent construction and design defects which have resulted in physical property damage and/or loss of use at the Project include, without limitation, defective plumbing including lack of proper sloping of sewage piping, leaking and backups in sinks and toilets caused by improperly sloped piping, unsealed pipe penetrations, improper use of PVC piping in the parking garage, defective HVAC systems including lack of ventilation in two buildings, defective ductwork, fire sprinklers that do not meet code, deflection in two buildings, incomplete installation of structural tie-downs, significant drainage issues and leaking in the Courtyard common area and pool decking, defective waterproofing on balcony decks in all 3 buildings, defective structural concrete balcony decks sloping inward towards balcony decks, leaking into and damage to balcony storage closets in one of the buildings, missing overflow scuppers, missing head flashing, lack of slope on the Courtyard common area deck, defective waterproofing and failure to install root barriers at common area planters, defective waterproofing at the common area deck and pool deck, lack of proper drainage and resulting damage to balconies on all three buildings, leaking windows, defects in vertical stucco cladding and concrete including but not limited to cracking and resulting water damage to building components, flooding in the game room, metal flashing defects in the game room, drainage problems in the parking garage, efflorescence, corrosion and water intrusion into the crawlspace beneath the Courtyard common area deck, inadequate seismic supports, defective interior fire doors, defective stairwell doors, defective parking garage gate, ponding water on the roofs, missing gas piping on roof, lack of rooftop insulation for piping, and inadequate roof access doors.

> 12.    MV has performed necessary temporary repairs on numerous apartment units already in order to make them habitable for tenants. MV has been compelled to discount its residential lease rates to induce tenants to reside in units which are compromised by these latent defects, reimburse certain tenants for damaged personal items located in storage closets, grant rent concessions to certain tenants, take units off the rental market while water intrusion damage is repaired, and has lost rent as a result of units which could not be rented.

9.    As part of the Underlying Action, MORENA VISTA and Legacy conducted visual and intrusive investigations of the construction conditions at the Project. These investigations further revealed that the Project contained substantial construction defects and resulting property damage to major building components, including but not limited to the following:

a.    <u>Buildings A & B</u>:  (1) *balconies*: discontinuities in the waterproofing membrane and sealant beneath sliding glass doors results in water leakage into unit interiors; improper sloping of concrete decks and height of paver wearing surface obstructs drainage from sliding glass door sill weeps; lack of waterproofing system drainage medium between concrete

1  setting bed and waterproofing membrane and lack of sloped topping under membrane; bi-level drain

2  weeps filled with concrete which inhibits drainage of water from membrane; and water on

3  waterproofing membrane allowed to flow behind the stucco and onto the building paper at balcony

4  outside corners; (2) *exterior walls*: cracking in adhered EIFS horizontal bands between first and

5  second floors, with large vertical cracks aligning with gaps between insulation boards; EIFS bands

6  not properly adhered to cement plaster; stucco cladding louvered vents penetrations not watertight,

7  allowing water to bypass to interior ductwork (which is also not watertight); and lack of drainage at

8  vertical stucco cladding above first-floor storefronts results in water intrusion and staining; (3)

9  *storefront doors and windows*: reverse slope at entry door thresholds, lack of threshold with upturned

10 leg and weather-stripping, lack of continuous seal beneath existing threshold and lack of pan flashing

11 between results in water leakage; discontinuous weather-stripping allows water to bypass doors;

12 discontinuous glazing gaskets at doors and storefront lights allow water leakage; lack of weeps at

13 storefront sill cans allows water intrusion; missing sealant between (a) sills of storefront assemblies

14 and exterior paving and (b) vertical and horizontal storefront mullion intersections allows water

15 intrusion; (4) *roofing*: ponding water results in staining; and (5) *ventilation*: corridors are not

16 ventilated.

17          b.     Building C: (1) *balconies*: improper termination of balcony closet drywall

18 below the concrete topping at the waterproofing membrane allows water on the membrane to wet the

19 drywall, resulting in building-wide staining and deterioration of drywall; water bypasses closet door

20 thresholds and pools on closet floors; improper termination of wood door frames at balcony closets

21 results in delamination; lack of waterproofing system drainage medium between concrete setting bed

22 and waterproofing membrane and lack of sloped topping under membrane; bi-level drain weeps

23 filled with concrete which inhibits drainage of water from membrane; balcony edge pour stop weeps

24 blocked with concrete; inadequate drainage at membrane level and building wall allows water to

25 back up behind sill flashing and flow beneath it to unit interior; improper extension of cementitious

26 fill into sill pan beneath sliding glass doors allows water intrusion into interior floor resulting in

27 stained carpet tack strips and wood baseboard; lack of overflow scuppers and improper sealing of

28 cement plaster base of wall flashing; (2) *courtyard pool/spa deck*:  discontinuous and failing

1   waterproofing membrane at pool/spa deck allows substantial water penetration into crawl space

2   below resulting in corrosion, calcification and efflorescence; improper termination of membrane at

3   edge of pool coping stone and lack of integration with pool waterproofing system allows water to

4   bypass the system; (3) *planters*: plant roots have grown through the waterproofing membrane

5   resulting in discontinuities and adhesive failure, water leakage into crawlspace below pool/spa deck

6   and efflorescence staining on CMU walls; (4) *exterior walls*: balcony metal edge flashing directs

7   water behind stucco cladding at outside corners; and lack of drainage at vertical stucco cladding at

8   balcony edges results in water intrusion, wet wood framing and wood deterioration; (5) *game room*

9   *doors*: inadequate drainage of plaza deck and building walls allows water to back up behind

10  downturned leg of sill flashing and flow into the interior, resulting in water stains; and water leaks

11  present around glazing in numerous locations; (6) *garage*: cracking in cementitous coating of south

12  wall resulting in water and calcification stains; inadequate trench drain at entrance/exit ramp

13  resulting in water ponding; inadequate backflow prevention valve for building storm drain system

14  resulting in water ponding during heavy storms; inadequate connections of sewer piping allows

15  leaking (7) *roofing*: water leakage at roof access doors due to inadequate flashing and weather-

16  stripping; (8) *seismic joints*: poor drainage of plaza deck results in overtopping of the curb behind

17  the expansion joint and water leakage into building interior; discontinuities at edges of seismic joint

18  cover allow water intrusion and leakage onto interior building floors; (9) *windows*: water intrusion at

19  slider sill tracks results in leakage onto interior window stools.

20          c.      In addition, plumbing pipe defects resulted in backups and other property

21  damage at all three buildings. (The construction deficiencies and resulting property damage listed in

22  Paragraphs 8 & 9 of this Complaint are hereinafter collectively referred to as the "Construction

23  Conditions").

24          10.     As a direct result of the Construction Conditions, MORENA VISTA sustained a

25  variety of damages exceeding $16 million in total, including (1) costs in excess of $12.6 million to

26  perform permanent repairs to the Construction Conditions; (2) costs of investigation (i.e.) *Stearman*

27  costs; (3) costs associated with temporary and permanent repairs already performed; (4) increased

28  operating expenses; (5) lost value of services; (6) other economic losses including tenant

concessions; (7) attorneys' fees; (8) prejudgment interest;  (9) other business interruption, additional overhead, management expenses, etc; and (10) loss of rental income.

## THE INSURANCE POLICIES

**The Arch Primary Policy.**

11.     Arch Specialty Insurance Company ("Arch") issued policy number GAC000136600, covering a period from October 15, 2004, to December 15, 2006, to Legacy and all contractors and subcontractors enrolled in the Owner Controlled Insurance Program ("OCIP") containing $5 million in general aggregate and products-completed aggregate limits (the "Arch Primary Policy").  A true and correct copy of the Arch Primary Policy is attached hereto as Exhibit A and incorporated herein by this reference.

12.     The Arch Primary Policy includes the following insuring agreement:

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

    **1.**     **Insuring Agreement.**

        **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for ... 'property damage' to which this insurance does not apply.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.     But:

        **(1)**     The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and

        **(2)**     Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B.**

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

    **1.**     We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend:

/ / /

7

a.      All expenses we incur

…

These payments will reduce the limits of insurance.

**SECTION V – DEFINITIONS**

17.     'Property damage' means:

a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.      Loss of use if tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

18.     'Suit' means a civil proceeding in which damages because of … 'property damage'… to which this insurance applies are alleged. 'Suit' includes:

a.      An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent…

13.     MORENA VISTA is informed and believes and thereon alleges that at the time the Arch Primary Policy was issued to Legacy, both Arch and Legacy understood, intended and agreed that Arch's obligation to pay Legacy's defense expenses in any "suit" seeking "property damage" potentially covered under the Arch Primary Policy in a third-party construction defect action was included within the term "expenses" within Section 1a of the Supplementary Payments Provision and would accordingly reduce the available policy limits.

14.     MORENA VISTA is informed and believes and thereon alleges that on or about January 28, 2011, Arch accepted Legacy's tender of defense and indemnity under the Arch Primary Policy and provided Legacy with a defense in the Underlying Action once it was filed.

**The ICSOP Excess Policy.**

15.     ICSOP issued excess CGL policy number 4204-2006 to Legacy and all contractors and subcontractors enrolled in the OCIP, effective from October 15, 2004, to December 15, 2006, containing $2 million in per occurrence and annual aggregate limits (the "ICSOP Excess Policy"). A true and correct copy of the ICSOP Excess Policy is attached hereto as Exhibit B and incorporated herein by this reference.

8

16.    The ICSOP Excess Policy includes the following insuring agreement and definitions:

As respects accidents or occurrences, whichever is applicable, taking place during the period of the Policy, the Company agrees to afford the Insured such additional insurance as the issuers of the Underlying Coverage specified in the schedule would afford the Insured by increasing the underlying limit combined provided that it is expressly agreed that liability shall attach to the Company:

(a)    only after the issuers of the Underlying Coverage have paid or have been held liable to pay the full amount of the said underlying limit, and

(b)    only as respects such additional amounts in excess thereof as would be payable by the Issuers of the Underlying Coverage if the said underlying limit were amended as aforesaid, and

(c)    in no greater amount than the limit(s) set forth under the Declarations ultimate net loss as respects each accident or occurrence, whichever is applicable, taking place during the period of this Policy – Subject to the limit(s) set forth under the Declarations ultimate net loss in the aggregate where applicable for each annual period during the currency of this Policy.

**DEFINITIONS (Per Endorsement No. 3)**

1.    **Ultimate Net Loss**. The words 'ultimate net loss' shall be understood to mean the amount payable in settlement of the liability of the Insured after making deductions for all recoveries for other valid and collectible insurances, excepting however the policy(ies) of the Primary Insurer(s) and shall include all Costs.

17.    MORENA VISTA is informed and believes and thereon alleges that with respect to products/completed operations coverage, the ICSOP Excess Policy's Revised Schedule of Underlying Insurance lists the Arch Primary Policy, only.  MORENA VISTA is further informed and believes and thereon alleges that Legacy had no other valid or collectible insurance extending coverage to claims for property damage involving the Project.

18.    MORENA VISTA is informed and believes and thereon alleges that Legacy promptly tendered its defense and indemnity of the Arbitration Action in writing to ICSOP.

**ICSOP's and the DOE Defendants' Improper Claims Handling Conduct and Discharge of Duty to Settle**

19.    MORENA VISTA is informed and believes and thereon alleges on November 15, 2011, and again on January 9, 2012, ICSOP provided Legacy with its coverage "observations." Therein, ICSOP took the position that it had no coverage obligation to Legacy because Arch had not paid its policy limits.  In addition, ICSOP disagreed with Arch's and Legacy's understanding that the

9

1  Arch Primary Policy was "burning limits" and ICSOP reserved the right to assert that the Arch

2  Primary Policy's available limits were not reduced by defense costs. Finally, ICSOP contended that

3  (1) certain defects, conditions and damages claimed by MORENA VISTA in the Underlying Action

4  did not qualify as covered "property damage" under the Arch Primary Policy and (2) the cost to

5  repair or replace damage qualifying as covered "property damage" would not exceed the Arch

6  Primary Policy's available limits.

7       20.    MORENA VISTA is informed and believes and thereon alleges that throughout the

8  course of the Underlying Action, Legacy's defense counsel hired by Arch, Lorber, Greenfield and

9  Polito, LLP ("Lorber"), provided Arch and ICSOP with regular status updates containing detailed

10  information regarding their (1) observation of MORENA VISTA's extensive destructive testing; (2)

11  evaluation of MORENA VISTA's preliminary and final defect lists, costs of repair, and settlement

12  demands; (3) experts' preparation of a defense scope of repair and bids for reconstruction, and (4)

13  opinions concerning defense-based, compromised-based, and claimant-based verdict estimates

14  should the matter proceed to arbitration award. Therein, Lorber consistently and repeatedly warned

15  Arch and ICSOP that its estimate, based on Legacy's own defense scope of repair, for a defense-

16  based arbitration award ranged from $6.9 million to $7.6 million and a compromise-based arbitration

17  award ranged from $11 million to $11.7 million, with neither estimate including MORENA VISTA's

18  $2.1 million in recoverable damages for *Stearman* costs, attorneys' fees, economic losses, costs of

19  emergency repairs, or prejudgment interest. Lorber further acknowledged that a claimant-based

20  arbitration award would easily range from $14.5 million to $16.5 million.

21       21.    MORENA VISTA is informed and believes and thereon alleges that during the

22  pendency of the Underlying Action, Arch notified ICSOP multiple times, including but not limited to

23  December 20, 2011, January 9, 2012, February 7, 2012, March 26, 2012, May 2, 2012, September

24  12, 2012, and October 30, 2012, of Arch's and Legacy's understanding that Arch's payment of

25  defense-related expenses would reduce the amount available for any indemnity payments by Arch.

26  MORENA VISTA is informed and believes and thereon alleges that on October 30, 2012, Arch

27  provided ICSOP with the following documentation: (1) a September 1, 2004, e-mail from insurance

28  broker Mr. Perdomo with Stewart Smith West requesting for Arch to bind primary coverage as

1  follows: "Project Specific Wrap Up Liability; CGL Occurrence Form – Defense inside;

2  $5MM/$5MM/5MM limits...;" (2) Arch's September 7, 2004, quote confirming "Defense Included

3  Within Policy Limits;" and (3) Arch's binder of insurance, stating "Defense Costs included in the

4  Limits."

5       22.    MORENA VISTA is informed and believes and thereon alleges on or about

6  November 14, 2011, and again on October 13, 2012, and October 29, 2012, among other occasions,

7  Arch tendered its available policy limits to ICSOP to attempt a resolution of MORENA VISTA's

8  claims and looked to ICSOP to contribute its $2 million limits to resolve the matter.  MORENA

9  VISTA is informed and believes and thereon alleges that in declining Arch's first tender on January

10 9, 2012, and in subsequent correspondence during the course of the Underlying Action, ICSOP took

11 the position that Arch's policy limits were not exhausted by its payment of the remaining limits

12 because ICSOP disagreed with Arch's contention that the Arch Primary Policy was "burning limits."

13 In addition, ICSOP claimed that the cost to repair and/or replace covered "property damage" at the

14 Project did not exceed Arch's available policy limits.

15      23.    On or about May 8, 2013, MORENA VISTA sent Legacy a settlement demand for the

16 combined $7 million limits of the Arch Primary Policy and ICSOP Excess Policy, which also offered

17 a release of claims against Legacy arising out of the Underlying Action (the "First Policy Limits

18 Demand").  The First Policy Limits Demand gave Legacy a May 23, 2013, deadline within which to

19 accept the settlement proposal, which was thereafter extended for an additional week to May 31,

20 2013, at Legacy's request.  While Arch offered its policy limits to partially satisfy the First Policy

21 Limits Demand, ICSOP failed and refused to respond to the First Policy Limits Demand.  As a

22 result, the First Policy Limits Demand expired without MORENA VISTA and Legacy reaching a

23 settlement.

24      24.    Subsequently, Legacy and MORENA VISTA agreed to settle approximately $3.4

25 million of MORENA VISTA's damages claim attributable to certain construction and/or design

26 defects which MORENA VISTA and Legacy understood ICSOP and Arch alleged were not covered

27 by the Arch Primary Policy and ICSOP Excess Policy for approximately $722,000.  As a result,

28 MORENA VISTA's total damages in the Underlying Action were reduced from $16.1 million to

1  approximately $12.7 million.

2       25.    On or about November 15, 2013, MORENA VISTA sent Legacy a second settlement

3  demand for the combined remaining limits of the Arch Primary Policy and ICSOP Excess Policy,

4  which also offered a release of claims against Legacy arising out of the Underlying Action (the

5  "Second Policy Limits Demand").  MORENA VISTA is informed and believes and thereon alleges

6  that on November 21, 2013, Legacy expressly informed ICSOP that "in light of the facts and

7  circumstance of the claim, as detailed in all of defense counsel Bruce Lorber's reports over the last

8  few years, liability is clear and the damages for covered claims alone are far in excess of the

9  combined policy limits."  Legacy also advised ICSOP that "Legacy concedes that in light of all

10  available evidence, Arch's policy has 'burning limits.'"  The Second Policy Limits Demand gave

11  Legacy a December 2, 2013, deadline by which to accept the settlement proposal.  Arch promptly

12  committed its remaining policy limits to contribute to the Second Policy Limits Demand.  As with

13  the First Policy Limits Demand, ICSOP failed and refused to respond to the Second Policy Limits

14  Demand.

15       26.    Due to ICSOP's unreasonable refusal to contribute its policy limits toward settlement,

16  Legacy and MORENA VISTA entered into a settlement agreement in December 2013, which

17  included a Confession of Judgment (the "Judgment") in the sum of $10.5 million and an assignment

18  of Legacy's rights under the ICSOP Excess Policy to MORENA VISTA in exchange for a covenant

19  not to execute.  A true and correct copy of the Judgment is attached hereto as Exhibit C and

20  incorporated herein by this reference.  The assignment provided in pertinent part:

21       3.3    Assignment of Claims.  In consideration of the agreements and covenants by
          MORENA VISTA as set forth in this Agreement, Legacy hereby assigns to MORENA
22            VISTA:

23            3.3.1   To the fullest extent permitted by law, all of its rights, title,
              beneficial, legal or equitable interests in any claims, causes of action,
24                and contracts of insurance which currently exist, or may arise or be
              found to exist in the future, including without limitation the ICSOP
25                Policy, described above, arising out of or relating to Legacy's
              construction operations on the Project or MORENA VISTA's claims in
26                the Arbitration Action.  These assigned rights include, but are not
              limited to, any actions founded upon breach of ICSOP's duty of good
27                faith and fair dealing, breach of contract, breach of fiduciary duty,
              breach of the duty to defend, breach of the duty to indemnify, failure to
28                undertake reasonable settlement efforts, failure to accept settlement

opportunities with policy limits, and any and all claims and causes of action Legacy may now have or hereafter acquire against ICSOP based upon ICSOP's failure to settle the Arbitration Action on behalf of Legacy in the Arbitration Action.

27.    On January 6, 2014, MORENA VISTA filed the Judgment, which was entered by the Court the following day.  MORENA VISTA is informed and believes and thereon alleges that on January 6, 2014, Legacy informed ICSOP of the parties' settlement, Legacy's assignment of its rights under the ICSOP Policy to MORENA VISTA, and the Judgment.  Therein, Legacy also informed ICSOP that "although Legacy confirmed its understanding that the Arch policy has burning limits, and Arch committed to pay the remaining limits, ICSOP never provided any type of response. ICSOP thereby knowingly and intentionally exposed Legacy to a judgment far in excess of the available coverage, in a situation where the insurers' counsel has reported on several occasions that it is very likely such a judgment will be the result if the case is not settled."  MORENA VISTA is informed and believes and thereon alleges that on January 31, 2014, ICSOP responded to Legacy, and took the position that the Second Policy Limits Demand was "unreasonable" because (1) ICSOP "continue[d] to disagree with Arch's assertion and Legacy's apparent concession that the primary policy issued by [Arch] is a 'burning limits' policy" and (2) ICSOP contend[ed] that the "repair costs proposed by both Morena Vista and Legacy relate primarily to the repair and replacement of defective work, as opposed to the repair and replacement of property damage that may have resulted from such defective work."

28.    On January 13, 2014, MORENA VISTA informed ICSOP that ICSOP owed MORENA VISTA, as Legacy's judgment creditor and third-party beneficiary under the ICSOP Excess Policy, a duty under the implied covenant of good faith and fair dealing to promptly pay its policy limits of $2 million to MORENA VISTA to partially satisfy the Judgment.  On January 31, 2014, ICSOP declined MORENA VISTA's demand. based on the following coverage positions:  (1) ICSOP's belief that the Arch Primary Policy's limits were $5 million, and until Arch paid or was held liable to pay $5 million, ICSOP's coverage obligations were not triggered; and (2) ICSOP's belief that the cost to address damages covered under the Arch Primary Policy and ICSOP Excess Policy remained well within the Arch Primary Policy limits.

29.     On or about February 28, 2014, Arch paid MORENA VISTA its remaining policy limits to partially satisfy the Judgment, which exhausted the Arch Primary Policy Limits.  A balance of $6,248,063.74 remains due and owing to MORENA VISTA under the Judgment.  To date, ICSOP has denied, and continues to deny, that it owes Legacy any coverage obligations under the ICSOP Policy for MORENA VISTA's claims in the Arbitration Action.  In addition, ICSOP has failed and refused, and continues to fail and refuse, to pay the ICSOP Excess Policy limits towards satisfaction of the Judgment.

## ICSOP's Company-Wide Policy Concerning its Refusal to Indemnify its Insureds

30.     MORENA VISTA is informed and believes and thereon alleges that ICSOP issues thousands of excess CGL insurance policies to California owners and/or general contractors between 2004 and the present similar to the ICSOP Excess Policy.  MORENA VISTA is informed and believes and thereon alleges that ICSOP has adopted a company-wide policy of denying indemnity coverage to its insureds for settlement of covered "property damage" claims in third-party construction defect actions by asserting the coverage position that the primary policy(ies) underlying ICSOP's excess coverage afford complete coverage for the third-party claimant's damages (hereinafter, the "Primary Coverage Company Policy.")

31.     MORENA VISTA is informed and believes and thereon alleges that ICSOP employs one or more of the following claims handling tactics in furtherance of the Primary Coverage Company Policy:

    a.     ICSOP mischaracterizes when a primary carrier has paid "the full amount of its underlying limit" for purposes of triggering its excess obligations, including by refusing to provide excess coverage where an insured and primary carrier agree that the primary policy is "burning limits" and the primary carrier contributes its remaining policy limits to settle a covered third-party "property damage" claim. Instead, ICSOP insists that the primary carrier must pay its full policy limits before its excess coverage attaches;

b.     ICSOP mischaracterizes the scope of what constitutes "property damage" under the terms of underlying primary policy, refuses to fully investigate a third-party claimant's allegations of "property damage" and refuses to find construction conditions that have occurred, and will continue to occur, to be covered "property damage;"

c.     In evaluating the extent of covered "property damage" involved in a third-party construction defect action, ICSOP relies upon inapplicable California state and federal case law, including without limitation (1) *F&H Construction v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364 (2004); *Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App. 3d 1027 (1993); *St. Paul Fire & Marine Ins. Co.*, 80 Cal. App. 3d 888 (1978); and *New Hampshire Ins. Co. v. Viera*, 930 F.2d 696 (9th Cir. 1991), which do not involve any evaluation of what construction conditions constitute covered physical "property damage" whatsoever; and (2) *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807 (1990) and *Bullock v. Maryland Casualty Co.*, 85 Cal. App. 4th 1435 (2001), in which no "property damage" had actually occurred and the claims at issue sought purely prophylactic damages; and

d.     In evaluating the extent of covered "property damage" involved in a third-party construction defect action, ICSOP ignores the California appellate court's decision in *Maryland Casualty Co. v. Reeder*, 221 Cal. App. 3d 961 (1990) regarding what type of construction conditions constitute physical "property damage" under its insuring agreement.

32.     MORENA VISTA is informed and believes and thereon alleges that ICSOP's company policy and claims handling tactics are employed for the purpose of favoring the financial interests of ICSOP over the interests of fully indemnifying its insureds such as Legacy.

## FIRST CAUSE OF ACTION

### (Breach of Written Contract – Duty to Indemnify – MORENA VISTA as Legacy's Assignee Against All Defendants)

33.     MORENA VISTA incorporates by reference Paragraphs 1 through 32, inclusive, of

1  this Complaint as though fully set forth at length herein.

2      34.    The ICSOP Excess Policy described above constitutes a written contract between

3  Legacy and ICSOP.

4      35.    MORENA VISTA is informed and believes and thereon alleges that the insurance

5  policies issued by DOES 1 through 50, inclusive, and each of them, constitute written contracts

6  between Legacy and DOES 1 through 50, inclusive, and each of them.

7      36.    MORENA VISTA is informed and believes and thereon alleges that the insuring

8  agreement in the ICSOP Excess Policy and the insurance policies issued by DOES 1 through 50,

9  inclusive, and each of them, require Defendants under the respective policies they issued, to

10  indemnify Legacy up to their respective policy limits for covered "property damage" claims in the

11  Underlying Action upon Arch's exhaustion of the Arch Primary Policy through settlement payments

12  of its remaining policy limits.

13      37.    MORENA VISTA is informed and believes and thereon alleges Legacy complied

14  with, or is excused from complying with all conditions in the ICSOP Excess Policy and the policies

15  issued by DOES 1 through 50, inclusive, and each of them, which govern Legacy's entitlement to

16  indemnity coverage in the Underlying Action.

17      38.    MORENA VISTA is informed and believes and thereon alleges that ICSOP and

18  DOES 1 through 50, and each of them, have breached their respective contracts of insurance with the

19  Legacy by, among other things failing and/or refusing to indemnify Legacy up to their respective

20  policy limits for MORENA VISTA's covered "property damage" claims in the Underlying Action

21  following Arch's exhaustion of the Arch Primary Policy through settlement payments of its

22  remaining policy limits.

23      39.    .The Defendants' breaches of their respective policies had the direct and proximate

24  result of depriving Legacy of the benefits of its excess insurance coverage, for which Legacy paid a

25  substantial premium.  By depriving Legacy of the benefits of its excess insurance coverage, ICSOP

26  and DOES 1 through 50, and each of them, caused Legacy to suffer damages including: (1) forcing

27  Legacy to settle the Underlying Action without the benefit of the contribution that ICSOP and DOES

28  1 through 50, inclusive, and each of them, were required to have provided under the terms of their

respective policies, and (2) severe financial harm and an impact on its creditworthiness due to (a) its insurers refused to settle MORENA VISTA's claim in the Underlying Action and (b) the entry of the Judgment. As a result of the Defendants' breaches of their obligations under their respective policies, Defendants are liable to Legacy up to their full policy limits towards satisfaction of the Judgment, plus interest in an amount to be proven at trial. As Legacy's assignee, MORENA VISTA is entitled to pursue these damages against ICSOP and Defendants DOES 1 through 50, inclusive, and each of them.

## SECOND CAUSE OF ACTION

### (Declaratory Relief - Duty to Indemnify – MORENA VISTA
### as Legacy's Assignee Against All Defendants)

40.     MORENA VISTA incorporates by reference Paragraphs 1 through 39, inclusive, of this Complaint as though fully set forth at length herein.

41.     An actual controversy has arisen and now exists between MORENA VISTA and ICSOP and DOES 1 through 50, inclusive, and each of them, concerning the parties' respective rights and duties under the ICSOP Excess Policy and policies issued by DOES 1 through 50, inclusive, and each of them. MORENA VISTA contends that the Defendants had a duty to indemnify Legacy up to their respective full policy limits for MORENA VISTA's covered "property damage" claims in the Underlying Action following Arch's exhaustion of the Arch Primary Policy through settlement payments of its remaining policy limits. The Defendants each dispute MORENA VISTA's contentions and contend that they only have a duty to indemnify Legacy up to their respective full policy limits for MORENA VISTA's covered "property damage" claims in the Arbitration Action once Arch exhausts the Arch Primary Policy through settlement payments of its full policy limits.

42.     MORENA VISTA desires a judicial determination of its rights and duties, and a declaration as to Defendants' duties to indemnify Legacy against the claims in the Underlying Action. Specifically, MORENA VISTA desires a declaration that Defendants each had a duty to contribute up to their respective full policy limits towards settlement of MORENA VISTA's covered "property damage" claims in the Underlying Action following exhaustion of the Arch Primary Policy

1   through settlement payments of its remaining policy limits.

2       43.     A judicial determination is necessary and appropriate at this time because Legacy has

3   sustained substantial damages, including, but not limited to a severe financial harm and an impact on

4   its creditworthiness due to (a) its insurers' refusal to settle MORENA VISTA's claims in the

5   Underlying Action and (b) the entry of the Judgment. As Legacy's assignee, MORENA VISTA has

6   expended money and/or incurred attorneys' fees and costs, and will continue to expend monies

7   and/or incur attorneys' fees and costs, associated with the retention of Sullivan, Hill, Lewin, Rez &

8   Engel, APLC to pursue and obtain insurance coverage under the excess insurance policies issued by

9   ICSOP and DOES 1 through 50, inclusive, and each of them.

10      44.     A judicial determination of the respective rights, duties and liabilities of the parties

11  under the above-referenced policies is necessary so that all of the parties can assess their respective

12  positions, rights and responsibilities and to avoid prejudicing Legacy's and MORENA VISTA's

13  rights.

14                              **THIRD CAUSE OF ACTION**

15      **(Breach of the Implied Covenant of Good Faith and Fair Dealing – MORENA VISTA**

16                  **as Legacy's Assignee Against All Defendants)**

17      45.     MORENA VISTA incorporates by reference Paragraphs 1 through 44, inclusive, of

18  this Complaint as though fully set forth at length herein.

19      46.     MORENA VISTA is informed and believes and thereon alleges that the ICSOP

20  Excess Policy and policies issued by DOES 1 through 50, inclusive, and each of them, contain an

21  implied covenant that no party to the contract will do anything to injure, frustrate, or interfere with

22  the right of the other party to receive the benefits of the contract. This implied covenant imposes a

23  duty of good faith and fair dealing on the parties and the duty to act in a fair and honest manner. The

24  duty of good faith and fair dealing specifically obligates ICSOP and DOES 1 through 50, inclusive,

25  and each of them, to refrain from putting their own interests above those of Legacy. As it relates to

26  the Defendants' duties to settle, in considering a settlement offer, the implied covenant requires the

27  Defendants as excess insurers to (1) conduct themselves as though they alone would be liable for the

28  entirety of a judgment against Legacy without considering whether a portion of the claim is not

1   covered under the terms of the policy; and (2) evaluate settlement options, including the First Policy

2   Limits Demand and Second Policy Limits Demand realistically and in good faith because ICSOP

3   was informed MORENA VISTA's claim Legacy's available insurance coverage.

4       47.   MORENA VISTA is informed and believes and thereon alleges that Legacy

5   repeatedly provided ICSOP and DOES 1 through 50, inclusive, and each of them, detailed

6   information regarding the factual and legal basis of Legacy's entitlement to indemnity coverage for

7   settlement of MORENA VISTA's covered "property damage" claims in the Underlying Action under

8   the ICSOP Policy and policies issued by DOES 1 through 50, inclusive, and each of them.  This

9   information included, but was not limited to, the pleadings in the Underlying Action; relevant

10  contract and project documentation illustrating the timing of work at the Project; conditions creating

11  "property damage" arising out of completed operations at the Project prior to the expiration of their

12  respective policies, including without limitation MORENA VISTA's preliminary and final defect

13  lists, costs of repair, and settlement demands, as well as Legacy's defense scope of repair and bids

14  for reconstruction; defense counsel's evaluations of defense-based, compromised-based, and

15  claimant-based verdict estimates should the matter proceed to arbitration award; and e-mail

16  correspondence and underwriting documentation, including Arch's quote and binder of insurance,

17  confirming Arch's and Legacy's understanding that the Arch Primary Policy was "burning limits."

18  Notwithstanding Legacy's efforts, ICSOP and DOES 1 through 50, inclusive, and each of them, have

19  failed and refused, and continue to fail and refuse, to afford Legacy indemnity coverage for

20  MORENA VISTA's covered "property damage" claims in the Underlying Action.

21      48.   MORENA VISTA is informed and believes and thereon alleges that  ICSOP and

22  DOES 1 through 50, inclusive, and each of them, breached their respective duties of good faith and

23  fair dealing owing to Legacy in various respects, including but not limited to some or all of the

24  following:

25      a.   unreasonably and in bad faith failing to diligently investigate thoroughly the facts and

26          applicable law in order to develop a good-faith opinion regarding MORENA VISTA's

27          claims and Legacy's entitlement to coverage;   .

28

b.    unreasonably and in bad faith mischaracterizing when Arch would be deemed to have paid "the full amount of its underlying limit" for purposes of triggering its excess obligations, including by refusing to provide excess coverage when Arch and Legacy agreed that the Arch Primary Policy was "burning limits" and Arch contributed its remaining policy limits to settle MORENA VISTA's covered "property damage" claim;

c.    unreasonably and in bad faith failing to provide Legacy with indemnity coverage to settle MORENA VISTA's covered "property damage" claims in the Arbitration Action following Arch's contribution of its remaining policy limits, resulting in substantial financial hardship to Legacy;

d.    unreasonably and in bad faith mischaracterizing the scope of what constitutes "property damage" under the terms of the Arch Primary Policy and ICSOP Excess Policy by, among other things, (1) engaging an outside consultant to review MORENA VISTA's cost of repair for the purpose of choosing limited construction conditions, including damaged drywall and/or carpet, to find covered as "property damage" and providing no evaluation whatsoever of whether other construction conditions, such as rusted or corroded window sill and door flashings or compromised waterproofing membranes, were covered "property damage," and (2) refusing to find construction conditions that have occurred, and will continue to occur, covered "property damage;"

e.    in evaluating the extent of covered "property damage" at the Project, unreasonably and in bad faith relying upon inapplicable California state and federal case law, including without limitation (1) *F&H Construction v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364 (2004); *Western Employers Ins. Co. v. Arciero & Sons, Inc.*, 146 Cal. App. 3d 1027 (1993); *St. Paul Fire & Marine Ins. Co.*, 80 Cal. App. 3d 888 (1978); and *New Hampshire Ins. Co. v. Viera*, 930 F.2d 696 (9th Cir. 1991), which do not involve any evaluation of what construction conditions constitute covered physical "property damage" whatsoever; and (2) *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d

20

807 (1990) and *Bullock v. Maryland Casualty Co.*, 85 Cal. App. 4th 1435 (2001), in which no "property damage" had actually occurred and the claims at issue sought purely prophylactic damages

f. in evaluating the extent of covered "property damage" at the Project, unreasonably and in bad faith ignoring the California appellate court's decision in *Maryland Casualty Co. v. Reeder*, 221 Cal. App. 3d 961 (1990) regarding what type of construction conditions constitute physical "property damage" under the insuring provisions of the Arch Primary Policy and ICSOP Excess Policy;

g. unreasonably and in bad faith implementing the Primary Coverage Company Policy against Legacy;

h. not attempting in good faith to effectuate the prompt, fair and equitable settlement of MORENA VISTA's claims, in which Legacy's liability had become reasonably clear;

i. unreasonably and in bad faith ignoring binding California Supreme Court precedent *Johansen v. California State Auto. Ass'n Inter-Insurance Bureau*, 15 Cal. 3d 9 (1975) and the California appellate court's decision in *Howard v. American Nat'l Fire Ins. Co.*, 187 Cal. App. 4th 498 (2010) in discharging its duty to make reasonable efforts to settle on behalf of Legacy by considering coverage defenses, such as the Primary Coverage Company Policy, in evaluating MORENA VISTA's settlement offers in the Underlying Action.

j. unreasonably and in bad faith discharging its duty to make reasonable efforts to settle on behalf of Legacy by failing and/or refusing to commit their respective policy limits to settle MORENA VISTA's covered "property damage" claims in the Underlying Action after being repeatedly informed by Legacy's defense counsel and personal counsel that MORENA VISTA's claims well-exceeded the Arch Primary Policy Limits and that any exposure in excess of the limits under the Arch Primary Policy would adversely impact Legacy's financial well-being; and

k. engaging in actions that demonstrated a greater concern for its monetary interests than for Legacy's financial risk.

49.     As a direct and proximate result of the Defendants' breaches of their respective duties of good faith and fair dealing, Legacy was deprived of the benefits of its excess insurance coverage, for which Legacy paid a substantial premium.  By unreasonably and unfairly depriving Legacy of the benefits of its excess insurance coverage, ICSOP and DOES 1 through 50, and each of them, caused Legacy to suffer damages including: (1) forcing Legacy to settle the Underlying Action without the benefit of the contribution that ICSOP and DOES 1 through 50, inclusive, and each of them, were required to have provided under the terms of their respective policies, and (2) severe financial harm and an impact on its creditworthiness due to (a) its insurers refused to settle MORENA VISTA's claim in the Underlying Action and (b) the entry of the Judgment.  As a result of the Defendants' tortious breaches of their obligations under their respective policies, Defendants are liable to Legacy for the full amount of the Judgment, attorney's fees incurred and/or paid to pursue coverage and/or policy benefits from ICSOP, plus interest in an amount to be proven at trial.  As Legacy's assignee, MORENA VISTA is entitled to pursue these damages against ICSOP and DOES 1 through 50, inclusive, and each of them.

## FOURTH CAUSE OF ACTION

### (Unlawful Business Practices Under Cal. Bus. & Prof. Code § 17200 – MORENA VISTA as Legacy's Assignee Against ICSOP)

50.     MORENA VISTA incorporates by reference Paragraphs 1 through 49, inclusive of this Complaint as though fully set forth at length herein.

51.     MORENA VISTA is informed and believes and thereon alleges that ICSOP's treatment of Legacy and MORENA VISTA is pursuant to deliberate, pre-meditated, and intentional company policy that is designed to save ICSOP money by unlawfully denying indemnity coverage to the Legacy for the Judgment reflecting covered "property damage" claims.  In particular, ICSOP is unlawfully applying the Primary Coverage Company Policy described in this Complaint against Legacy to the detriment of MORENA VISTA.

52.     MORENA VISTA is informed and believes and thereon alleges that ICSOP's Primary Coverage Company Policy as described herein is unlawful, and unreasonably and unfairly deprives Legacy of the indemnity coverage to which it is entitled and for which Legacy negotiated under the

1  ICSOP Excess Policy and of which Legacy had a reasonable expectation. As applied to MORENA

2  VISTA, it deprives MORENA VISTA of the funds necessary to partially satisfy the Judgment.

3    53.   MORENA VISTA is informed and believes and thereon alleges that in furtherance of

4  or as a result of ICSOP's Primary Coverage Company Policy as described herein:

5      a.   ICSOP did not advise Legacy of its Primary Coverage Company Policy at the

6  time it sold and underwrote the ICSOP Excess Policy;

7      b.   the insuring agreement of the ICSOP Excess Policy provides that ICSOP will

8  provide indemnity to Legacy upon Arch's payment of the Arch Primary Policy limits, and Arch and

9  Legacy agreed that the Arch Primary Policy had "burning limits," yet the application of the Primary

10  Coverage Company Policy operates to effectively deny indemnity coverage to Legacy by

11  mischaracterizing (1) when Arch is deemed to have paid its "full underlying limits" and (2) when

12  "property damage" occurred at the Project, rendering the language of the insuring agreement

13  described in Paragraph 16 of this Complaint illusory; and

14      c.   ICSOP has no intention of affording indemnity coverage Legacy or paying

15  MORENA VISTA its $2 million policy limits to partially settle the Judgment.

16    54.   MORENA VISTA is informed and believes and thereon alleges that ICSOP's Primary

17  Coverage Company Policy described in this Complaint constitutes an unlawful business practice

18  within the meaning of California Business and Professions Code Section 17200 *et seq*.

19    55.   MORENA VISTA is informed and believes and thereon alleges that as a direct and

20  proximate result of ICSOP's unlawful business practice described above, Legacy as had, and will

21  continue to have, insurance claims wrongfully denied by ICSOP resulting in great expense to

22  Legacy, as well as resulting in an inappropriate windfall and undeserved profits to ICSOP.

23    56.   MORENA VISTA is informed and believes and thereon alleges that Legacy is entitled

24  to injunctive relief, pursuant to California Business and Professions Code Section 17203, because

25  Legacy will suffer irreparable harm unless ICSOP is restrained from performing the unlawful acts,

26  misrepresentations, omissions, and practices comprising the Primary Coverage Company Policy

27  described herein because unless restrained, ICSOP will continue to engage in the unlawful business

28  practice described herein because, among other things, such business practice: (1) creates an

1   irresistible incentive to ICSOP to deny claims where ICSOP is legally obligated to afford coverage to

2   Legacy; and (2) has resulted in tremendous profits to ICSOP in avoiding coverage obligations on

3   multiple claims where such obligations are owed by ICSOP to Legacy.  Therefore, Legacy is entitled

4   to injunctive relief because it has no other adequate remedy at law to prevent ICSOP from

5   continuing to assert its company policies in future construction defect cases and tenders.

6       57.    MORENA VISTA is informed and believes and thereon alleges that MORENA

7   VISTA is entitled to an injunction which restrains ICSOP from applying its Primary Coverage

8   Company Policy against Legacy and MORENA VISTA.  MORENA VISTA is also entitled to

9   restitution, which restores to MORENA VISTA the ill-gotten profits and cost savings ICSOP derived

10  from applying its Primary Coverage Company Policy to Legacy and MORENA VISTA.

11                          **FIFTH CAUSE OF ACTION**

12              **(Recovery of Judgment Under Cal. Ins. Code § 11580(b)(2)**

13                   **– MORENA VISTA Against All Defendants)**

14      58.    MORENA VISTA incorporates by reference Paragraphs 1 through 39, inclusive of

15  this Complaint as though fully set forth at length herein.

16      59.    California Insurance Code Section 11580(b)(2) provides that "whenever judgment is

17  secured against the insured ... in an action based upon...property damage, then an action may be

18  brought against the insurer on the policy ... by such judgment creditor to recover on the judgment."

19      60.    Upon the Court's entry of the Judgment on January 7, 2014, MORENA VISTA

20  became a third party beneficiary of the ICSOP Excess Policy and the policies issued by DOES 1

21  through 50, inclusive, and each of them.  Both Legacy and MORENA VISTA gave ICSOP and DOE

22  Defendants 1 through 50, inclusive, and each of them, proper notice of the Judgment.  Despite such

23  notice, Defendants failed and/or refused, and continue to fail and/or refuse, to pay MORENA VISTA

24  the amounts due under the Judgment, which reflects covered "property damage" under their

25  respective excess policies.

26      61.    Pursuant to California Insurance Code Section 11580(b)(2), MORENA VISTA is

27  entitled to recover the Judgment against Legacy from ICSOP and DOES 1 through 50, inclusive, and

28  each of them, in an amount up to their respective policy limits, plus interest thereon in an amount to

1  be determined at trial.

2  ## SIXTH CAUSE OF ACTION

3  ### (Breach of the Implied Covenant of Good Faith and Fair Dealing

4  ### – MORENA VISTA Against All Defendants)

5  62.  MORENA VISTA incorporates by reference Paragraphs 1 through 39, inclusive,

6  Paragraphs 46 through 49, inclusive, and Paragraphs 59 through 61, inclusive, of this Complaint as

7  though fully set forth at length herein.

8  63.  As Legacy's judgment creditor and a third-party beneficiary of the policies issued by

9  ICSOP and DOES 1 through 50, inclusive, and each of them, to Legacy, ICSOP and DOES 1

10  through 50, inclusive, and each of them, owe MORENA VISTA a duty under the implied covenant

11  of good faith and fair dealing not to unreasonably withhold payment of damages to which Legacy

12  become obligated by a final judgment.

13  64.  MORENA VISTA is informed and believes and thereon alleges that ICSOP and

14  DOES 1 through 50, inclusive, and each of them, breached their respective duties of good faith and

15  fair dealing owing to MORENA VISTA by unreasonably and in bad faith failing to offer their

16  respective policy limits to satisfy the Judgment despite MORENA VISTA's demands to so, and

17  despite the fact that the Judgment reflects covered "property damage" under their respective policies

18  for the same reasons that ICSOP and DOES 1 through 50, inclusive, and each of them, unreasonably

19  refused to settle the Underlying Action on behalf of Legacy.

20  65.  As a direct and proximate result of the Defendants' breach of the implied covenant of

21  good faith and fair dealing, MORENA VISTA has been damaged in an amount according to proof at

22  trial, together with interest and the attorneys' fees and costs MORENA VISTA incurred associated

23  with the retention of Sullivan, Hill, Lewin, Rez & Engel, APLC to pursue and obtain insurance

24  coverage from ICSOP and DOES 1 through 50, inclusive, and each of them.

25  66.  In acting as set forth above, MORENA VISTA is informed and believes and thereon

26  alleges that ICSOP has engaged in despicable conduct with a conscious disregard for the MORENA

27  VISTA's rights, and with an intent to vex, injure and annoy MORENA VISTA, such as to constitute

28  oppression, fraud, or malice under California Civil Code Section 3294, justifying punitive and

VERIFIED COMPLAINT

1   exemplary damages in an amount to be determined by proof at the time of trial sufficient to punish

2   and set an example of Defendants.   In particular, ICSOP knew the Judgment reflected covered

3   "property damage" but, to further its own economic interests MORENA VISTA's expense, ICSOP

4   consciously and deliberately disregarded MORENA VISTA's rights and unreasonably refused, and

5   continues to refuse, to pay its policy limits towards satisfaction of the Judgment.  MORENA VISTA

6   is informed and believes and thereon alleges that all of the above-alleged acts were performed or

7   ratified by ICSOP's managerial employees, who acted with knowledge that ICSOP's conduct would

8   harm MORENA VISTA.

9                                    **PRAYER FOR RELIEF**

10          WHEREFORE, MORENA VISTA prays for judgment against ICSOP and DOES 1 through

11   50, inclusive, and each of them, as follows:

12   **AS AND FOR THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT-DUTY TO**

13   **INDEMNIFY:**

14          1.      General and special damages in an amount according to proof at trial;

15          2.      Pre-judgment interest on said damages at the rate of at least ten percent per annum as

16   permitted by law; and,

17          3.      Costs of suit;

18   **AS AND FOR THE SECOND CAUSE OF ACTION FOR DECLARATORY RELIEF:**

19          1.      A declaration of Legacy's rights concerning the duties of ICSOP and DOES 1 through

20   50, inclusive, and each of them, to indemnify Legacy against MORENA VISTA's claims in the

21   Underlying Action;

22          2.      A declaration that ICSOP and DOES 1 through 50, inclusive, and each of them, have

23   a duty to indemnify Legacy in the Underlying Action, including contributing their respective full

24   policy limits towards any settlement of covered "property damage" claims following Arch's

25   exhaustion of the Arch Primary Policy through settlement payments of its remaining policy limits;

26   and,

27          3.      Costs of suit;

28   ///

1   **AS AND FOR THE THIRD CAUSE OF ACTION FOR TORTIOUS BREACH OF THE**

2   **IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**

3        1.     General, special and consequential damages proximately caused by ICSOP and

4   DOES 1 through 50, inclusive, and each of them, according to proof at trial;

5        2.     Reasonable attorneys' fees and other expenses incurred to pursue and establish

6   coverage; and,

7        4.     Costs of suit;

8   **AS AND FOR THE FOURTH CAUSE OF ACTION FOR UNLAWFUL BUSINESS**

9   **PRACTICES UNDER CALIF. BUS. & PROF. CODE § 17200 AGAINST DEFENDANT**

10   **ICSOP ONLY:**

11        1.     For injunctive relief restraining ICSOP from engaging in the Primary Coverage

12   Company Policy described herein against Legacy;

13        2.     For an accounting of all ill-gotten marginal profits and savings attributable to the

14   Primary Coverage Company Policy as applied to Legacy; and

15        3.     For an order of restitution to restore to MORENA VISTA, as Legacy's assignee, all

16   ill-gotten marginal profits and cost savings attributable to the Primary Coverage Company Policy

17   that has been applied against Legacy;

18   **AS AND FOR THE FIFTH CAUSE OF ACTION FOR RECOVERY OF JUDGMENT:**

19        1.     Recovery of the Judgment against Legacy, up to the Defendants' policy limits;

20        2.     Pre-judgment interest on said damages at the rate of at least ten percent per annum as

21             permitted by law; and,

22        3.     Costs of suit;

23   **AS AND FOR THE SIXTH CAUSE OF ACTION FOR TORTIOUS BREACH OF THE**

24   **IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**

25        1.     General, special and consequential damages proximately caused by ICSOP and

26   DOES 1 through 50, inclusive, and each of them, according to proof at trial;

27        2.     Punitive damages against ICSOP in an amount sufficient to punish, deter and make an

28   example of ICSOP, and according to proof at trial;

VERIFIED COMPLAINT

3.    Reasonable attorneys' fees and other expenses incurred to pursue and establish coverage; and,

4.    Costs of suit;

**AS AND FOR ALL CAUSES OF ACTION:**

1.    Prejudgment interest at the rate of at least ten percent per annum as permitted by law; and,

2.    For such other and further relief as is just and proper.


Dated:    July 9, 2014              SULLIVAN, HILL, LEWIN, REZ & ENGEL
                                    A Professional Law Corporation



                          By:    _Catherine Hanna-Blentzas_
                                 Timothy C. Earl
                                 Catherine A. Hanna-Blentzas
                                 Attorneys for Plaintiff MORENA VISTA, LLC

## VERIFICATION

I, William Jones, am the President of Plaintiff MORENA VISTA, LLC ("MORENA VISTA") in the above-referenced action. I am authorized to make this verification on behalf of MORENA VISTA. I have read the foregoing VERIFIED COMPLAINT FOR BREACH OF CONTRACT (DUTY TO INDEMNIFY); DECLARATORY RELIEF; BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (DUTY TO SETTLE); UNLAWFUL BUSINESS PRACTICES; RECOVERY OF JUDGMENT; AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (FAILURE TO PAY JUDGMENT). I am informed and believe the matters therein to be true and on that ground I allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 10, 2014, at San Diego, California.


_____
William Jones

29
VERIFIED COMPLAINT

**EXHIBIT A**



# Arch
## Insurance Group

## ARCH SPECIALTY INSURANCE COMPANY
A Wisconsin Corporation

Home Office Address:
300 First Stamford Place, 5th Floor
Stamford, CT 06902

Administrative Office Address:
One Liberty Plaza, 53rd Floor
New York, NY 10006
(800) 817-3252

### COMMERCIAL GENERAL LIABILITY POLICY DECLARATIONS

POLICY NUMBER: GAC 0001366 00

RENEWAL OF: NEW

EFFECTIVE DATE: 10/15/04
EXPIRATION DATE: 10/15/08
12:01 AM STD Time at the Address of the Named Insured

AGENT CODE:

**Item 1.  Named Insured and Producing Agent**

Named Insured:  LEGACY BUILDING SERVICES, INC. AND ALL CONTRACTORS AND SUBCONTRACTORS
IN THE OWNER CONTROLLED INSURANCE PROGRAM (OCIP)

Mailing Address:  2505 CONGRESS STREET
SAN DIEGO, CA 92110

Producing Agent:  STEWART SMITH WEST, INC.

Mailing Address:  535 NORTH BRAND BLVD.
SUITE 800
GLENDALE, CA 91203

Surplus Line Broker: ED PERDOMO
STEWART SMITH WEST, INC.

Mailing Address:  535 NORTH BRAND BLVD.
SUITE 800
GLENDALE, CA 91203

Surplus Lines License #: 0C41309

**Item 2. Named Insured Classified as:**

☐ Individual
☐ Joint Venture
☐ Partnership
☒ LLC
☐ Corporation
☐ LLP

**Item 3.  Limits of Insurance**

| | |
|---|---|
| BODILY INJURY AND PROPERTY DAMAGE LIABILITY – EACH OCCURRENCE | $ 5,000,000 |
| PERSONAL AND ADVERTISING INJURY LIMIT – EACH OFFENSE | $ 1,000,000 |
| MEDICAL EXPENSE LIMIT – ANY ONE PERSON | $ N/A |
| GENERAL AGGREGATE LIMIT (Other Than Products – Completed Operations) | $ 5,000,000 |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ 5,000,000 |
| DAMAGES TO PREMISES RENTED TO YOU LIMIT – EACH OCCURRENCE | $ N/A |

**Item 4. Policy Premium: $ 950,000**

Deposit Premium $ 950,000 which is:   ☐ A Flat Charge Per Each Policy Period.
☒ Adjustable at the end of each Audit Period, Per Premium Computation Endorsement

Minimum Retained Audit Premium
Minimum Retained Premium 35%, not subject to adjustment in the event of cancellation by you.

RECEIVED

DEC 1 3 2004

WILLIS RISK & INSURANCE SERVICES

06 CGLD0047 00 06 03

Page 1 of 2

Item 5. Forms and Endorsements attached: See Schedule of Forms and Endorsements Form 00 ML0012 00 01 03

In consideration of the payment of premium and in reliance upon statements made in the application this policy including all endorsements issued herein shall constitute the contract between the Company and the Named Insured.

Arch Specialty Insurance Company is not licensed in the state of New York and is not subject to its supervision.

# SCHEDULE OF FORMS AND ENDORSEMENTS

| NAMED INSURED: LEGACY BUILDING SERVICES, INC. AND ALL | TERM: 10/15/2004  to  10/15/2006 |
|---|---|
| CONTRACTORS AND SUBCONTRACTORS IN THE OWNER | |
| CONTROLLED INSURANCE PROGRAM (OCIP) | |
| POLICY NUMBER: GAC 0001366 00 | |

| ENDT. NO. | | FORM NO. | TITLE |
|---|---|---|---|
| | √ | 06 CGLD0047 00 06 03 | COMMERCIAL GENERAL LIABILITY POLICY DECLARATIONS |
| | √ | 00 ML0012 00 01 03 | SCHEDULE OF FORMS AND ENDORSEMENTS |
| | √ | 06 CGL0098 00 07 03 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| | √ | 06 ML0002 00 07 03 | SIGNATURE PAGE |
| | √ | 02 ML 0003 00 08 02 | SERVICE OF SUIT |
| 1 | . | 00 CGL0127 00 08 04 | LIMITED BLANKET ADDITIONAL INSURED ENDORSEMENT DEDUCTIBLE VERSION (NOT INCLUDING PRODUCTS-COMPLETED OPERATIONS) |
| 2 | √ | 00 CGL0092 00 05 03 | CHROMATED COPPER ARSENATE ("CCA") EXCLUSION |
| 3 | | 00 CGL0141 00 03 04 | SILICA EXCLUSION |
| 4 | √ | 00 CGL0016 00 03 04 | EXTERIOR INSULATION AND FINISH SYSTEM EXCLUSION |
| 5 | √ | 00 CGL0039 00 12 02 | ENGINEERS, ARCHITECTS OR SURVEYORS PROFESSIONAL LIABILITY EXCLUSION |
| 6 | | 02 CGL0011 00 10 02 | EARTH MOVEMENT OR SUBSIDENCE EXCLUSION |
| 7 | √ | 02 CGL0018 00 10 02 | INTELLECTUAL PROPERTY EXCLUSION |
| 8 | √ | 00 CGL0138 00 01 04 | SUPPLEMENTARY PAYMENTS REDUCE THE LIMITS OF INSURANCE: DEDUCTIBLE POLICY ENDORSEMENT |
| 9 | √ | 00 CGL0069 00 02 03 | APPLICATION AS WARRANTY CONDITION |
| 10 | √ | 00 CGL0080 00 07 04 | RESIDENTIAL AND RESIDENTIAL CONVERSION EXCLUSION |
| 11 | √ | 00 CGL0068 00 02 03 | RADON CONTAMINATION EXCLUSION |
| 12 | √ | 00 CGL0072 00 03 03 | NAMED INSURED ENDORSEMENT |
| 13 | √ | 00 CGL0110 00 08 04 | CONSTRUCTION PROJECT ENDORSEMENT |
| 14 | √ | 02 CGL0107 00 09 03 | PREMIUM COMPUTATION ENDORSEMENT - DEDUCTIBLE POLICY VERSION |
| 15 | √ | 00 CGL0099 00 10 03 | DEDUCTIBLE LIABILITY ENDORSEMENT |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## ☆Arch
### Insurance Group

**ARCH SPECIALTY INSURANCE COMPANY**
**300 First Stamford Place, 5th Floor**
**Stamford, CT 06902**

**COMMERCIAL GENERAL LIABILITY**

**06 CGL0098 00 07 03**

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under SECTION II – WHO IS AN INSURED.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION V–DEFINITIONS.

### SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our sole discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

**2. Exclusions**

This insurance does not apply to:

a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law(s).

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or

any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat,

smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes but is not limited to: civil war, insurrection, usurped power, rebellion or revolution.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. Damage To Your Product

"Property damage" to "your product" arising out of "your product" or any part of "your product".

l. Damage To Your Work

"Property damage" to "your work" arising out of "your work" or any part of "your work" and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

Exclusions j. through m. do not apply to damage by fire to premises while rented to

you or temporarily occupied by you, with permission of the owner. A separate limit of insurance applies to this coverage as described in SECTION III – LIMITS OF INSURANCE.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

p. **Asbestos**

"Bodily injury" or "property damage", including but not limited to, compliance with any action authorized or required by law, which arises out of or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means actual, alleged or threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, the failure to warn, advise or instruct related to asbestos, the failure to prevent exposure to asbestos, or the presence of asbestos in any place whatsoever, whether or not within a building or structure.

q. **Nuclear Liability**

"Bodily injury" or "property damage"

(1) with respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be

an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

(3) under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization; or

(4) under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(a) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(b) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

(c) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

As used in this exclusion:

(1) "Hazardous properties" includes radioactive, toxic or explosive properties.

(2) Nuclear material" means "source material", "Special nuclear material" or "by-product material".

(3) "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

(4) "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

(5) "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

(6) "Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing "spent fuel", or (iii) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(7) "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

(8) "Property damage" includes all forms of radioactive contamination of property.

r. Employment Related Practices

Any "bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, act or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person;

(d) Action under Title VII of the 1964 Civil Rights Act and/or any amendments thereto; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of any injury or damage to that person at whom any of the employment-related practices described in Paragraphs (a), (b), (c) or (d) above is directed.

This exclusion applies:

(1) Whether the insured may be held liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

s. Prior Loss

Any "bodily injury" or "property damage ", if such injury or damage is a continuation of, or arises out of injury or damage that commenced prior to the inception date of the policy.

t. Fungi, Mold and Mildew

"Bodily injury" or "Property damage" arising out of fungi, including but not

limited to, mold or mildew, and any microtoxins, spores, scents, vapors, gases, or byproducts produced or released by fungi, regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that liability, damage, loss, cost, expense or other type of obligation.

u. Lead

"Bodily injury" or "property damage", including but not limited to, compliance with any action authorized or required by law, which arises out of, in whole or in part; the ingestion, inhalation, absorption or exposure to lead, either directly or indirectly, in any manner or form whatsoever.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **Supplementary Payments – Coverages A and B.**

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract.

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under Section V – Definitions.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Fungi, Mold and Mildew**

"Personal and advertising injury" arising out of fungi, including but not limited to,

mold or mildew, and any microtoxins, spores, scents, vapors, gases, or byproducts produced or released by fungi, regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that liability, damage, loss, cost, expense or other type of obligation.

**o. Employment-Related Practices**

"Personal and Advertising Injury" arising out of employment-related practices to:

(1) A person arising out of any:

(a) Refusal to employ;

(b) Termination of a person's employment; or

(c) Employment-related practices, policies, act or omissions, including but not limited to, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(d) Action under Title VII of the 1964 Civil Rights Act and/or any amendments thereto; or

(2) any other person as a consequence of any injury or damage to that person at whom any of the employment-related practices described in Paragraphs (a), (b), (c) or (d) above is directed.

This exclusion applies:

(1) Whether or not the insured may be held liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of any such injury.

**p. Asbestos**

"Personal and advertising injury", including but not limited to, compliance with any action authorized or required by law, which arises out of or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means actual, alleged or

threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, the failure to warn, advise or instruct related to asbestos, the failure to prevent exposure to asbestos, or the presence of asbestos in any place whatsoever, whether or not within a building or structure.

q. Lead

"Personal and advertising injury", including but not limited to, compliance with any action authorized or required by law, which arises out of, in whole or in part, the ingestion, inhalation, absorption or exposure to lead, either directly or indirectly, in any manner or form whatsoever.

COVERAGE C MEDICAL PAYMENTS

1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(a) The accident takes place in the "coverage territory" and during the policy period;

(b) The expenses are incurred and reported to us within one year of the date of the accident; and

(c) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

We will not pay expenses for "bodily injury":

a. Any Insured

To any insured, except "volunteer workers".

b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

d. Workers Compensation And Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. Athletics Activities

To a person injured while taking part in athletics.

f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

g. Coverage A Exclusions

Excluded under Coverage A.

h. War

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

i. Clubs

If you are a club, to any of your members.

j. Medical Expenses

Arising from or in connection with any medical expenses for services by you, any of your employees or any person or organization under a contract to you to provide such services.

k. Fungi, Mold and Mildew

Arising out of fungi, including but not limited to, mold or mildew, and any microtoxins, spores, scents, vapors,

gases, or byproducts produced or released by fungi, regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that liability, damage, loss, cost, expense or other type of obligation.

l. **Lead**

Arising out of, in whole or in part, the ingestion, inhalation, absorption or exposure to lead, either directly or indirectly, in any manner or form whatsoever.

m. **Asbestos**

Which arises out of or would not have occurred, in whole or in part, but for the "asbestos hazard."

As used in this exclusion, "asbestos hazard" means actual, alleged or threatened exposure to asbestos in any manner or form whatsoever, either directly or indirectly, the failure to warn, advise or instruct related to asbestos, the failure to prevent exposure to asbestos, or the presence of asbestos in any place whatsoever, whether or not within a building or structure.

n. **Pollution**

Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is an obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an

offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraphs 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to

you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance apply to the policy period set forth in the Declarations or any endorsements thereto.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this policy.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   Notice of an "occurrence" or an offense is not notice of a claim.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this policy:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

This insurance is excess over any other valid and collectible insurance that applies to any claim or "suit" to which this insurance applies, whether such other insurance is written on a primary, excess, contingent or on any other basis (except if that other insurance is specifically written to apply excess of this insurance), and this insurance will not contribute with any other such insurance.

### 5. Premium Audit

a. We will compute all premiums for this policy in accordance with our rules and rates.

b. Premium shown in this policy as advance premium is a deposit premium only. At the close of each audit period we will

compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

### 6. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

### 7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

### 8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair our rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

### 9. When We Do Not Renew

If we decide not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

### 10. Cancellation

a. The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

e. If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

**11. Changes**

This policy contains all agreements between you and us concerning the insurance afforded. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**12. Inspection**

We shall be permitted but not obligated to inspect, sample and monitor on a continuing basis the insured's property or operations, at any time. Neither our right to make inspections, sample and monitor nor the actual undertaking thereof nor any report thereon shall constitute an undertaking, on behalf of the insured or others, or determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule or regulation.

**13. Named Insureds**

a. The First Named Insured is authorized to act on behalf of all persons or organizations insured under this policy with respect to all matters pertaining to the insurance afforded by the policy.

b. Each Named Insured is jointly and severally liable for:

(1) All premiums due under this policy; and

(2) All obligations that arise due to the self-insured retention including claim expenses

(3) Any other financial obligations of the Named Insured to us arising out of any agreements contained in this policy.

**14. Transfer of Your Rights and Duties under this policy**

Your rights and duties under this policy may not be transferred without our written consent, except in the case of death to an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury; sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in Paragraph a. above;

      (2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A written contract for a lease of premises. However, that portion of the written contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A written sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. A written elevator maintenance agreement;

   f. That part of any other written contract or written agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any written contract or written agreement.

   Paragraph f. does not include that part of any written contract or written agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change

orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph (2) above or supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraphs a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraphs a., b., c. or d., above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or

premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication of material, in any manner, that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

All "personal and advertising injury" arising out of the same or similar material, regardless of the mode in which such material is communicated, including but not limited to publication by means of Internet, extra-net, email or website, will be considered as arising solely out of one offense.

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard" means:

**a.** All "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another

contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** This does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

  a. Means:

    (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a) You;

      (b) Others trading under your name; or

      (c) A person or organization whose business or assets you have acquired; and

    (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  b. Includes

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    (2) The providing of or failure to provide warnings or instructions.

  c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

  a. Means:

    (1) Work or operations performed by you or on your behalf; and

    (2) Materials, parts or equipment furnished in connection with such work or operations.

  b. Includes

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    (2) The providing of or failure to provide warnings or instructions.



## Arch
### Insurance Group

Signature Page

YOUR COMPLETE POLICY CONSISTS OF THE POLICY JACKET WITH THE
COVERAGE FORMS, DECLARATIONS, AND ENDORSEMENTS, IF ANY.

IN WITNESS WHEREOF, Arch Specialty Insurance Company has caused this policy to
be executed and attested, and, if required by state law, this policy shall not be valid
unless countersigned by a duly authorized representative of the company.

_____

Ralph E. Jones III

President

_____

Martin J. Nilsen

Secretary

06 ML0002 00 07 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal. The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

02 ML 0003 00 08 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**LIMITED BLANKET ADDITIONAL INSURED ENDORSEMENT**
**DEDUCTIBLE VERSION**
**(NOT INCLUDING PRODUCTS-COMPLETED OPERATIONS)**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SECTION II – WHO IS AN INSURED** is amended to include as an additional insured those persons or organizations who are required under a written contract with the Named Insured to be named as an additional insured, but only with respect to liability arising out of your ongoing operations.

As used in this endorsement, the word "your" refers to the Named Insured.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 1

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0127 00 08 04                                                         Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CHROMATED COPPER ARSENATE ("CCA") EXCLUSION**

This insurance does not apply to and we will not have the duty to investigate or defend any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of any product treated with, preserved with, or containing chromated copper arsenate ("CCA").

All other terms and conditions of this Policy remain unchanged.

Endorsement Number:2

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001368 00

Named Insured:

Endorsement Effective Date:

00 CGL0092 00 05 03                                                                          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SILICA EXCLUSION**

This policy does not apply to:

Any claim, "suit," demand or loss that alleges "bodily injury," "property damage," or "personal and advertising injury" (including but not limited to, compliance with any request, demand, order, or statutory or regulatory requirement or any other action authorized or required by law), including any costs, fees, expenses, penalties, judgments, fines, or sanctions arising therefrom, which arises out of, or relates to, in whole or in part, the "silica hazard" or would not have occurred, in whole or in part, but for the "silica hazard".

As used in this exclusion, "silica hazard" means:

    (1)    actual, alleged or threatened exposure to "silica" either directly or indirectly, or

    (2)    the actual or alleged failure to warn, advise or instruct related to "silica", or

    (3)    the actual or alleged failure to prevent exposure to "silica", or

    (4)    the actual or alleged presence of "silica" whether or not within a building or structure.

As used in this exclusion, "silica" means any substance, regardless of its form or state, containing silicon, including but not limited to silicon, silica, silicates and silicone.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 3

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0141 00 03 04 ·                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXTERIOR INSULATION AND FINISH SYSTEM EXCLUSION**

This insurance does not apply to and we will not have the duty to investigate or defend any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of:

1.  "bodily injury", "property damage", or "personal and advertising injury" caused directly or indirectly, in whole or in part, by the design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction, or replacement, of an "exterior insulation and finish system" or any part thereof, any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulkings or sealants in connection with such a system; or

2.  Any moisture-related or dry rot related "property damage" to a house or other building to which an "exterior insulation and finish system" has been applied, if that "property damage" is caused directly or indirectly, in whole or in part, by the "exterior insulation and finish system";

Regardless of any other cause or event that contributed concurrently or in any sequence to that injury or damage.

For the purposes of this endorsement, an "exterior insulation and finish system" means an exterior cladding or finish system applied to a house or other building, and consisting of:

a)  A rigid or semi-rigid sheathing or insulation board, including gypsum-based, wood-based, or insulation-based materials; and

b)  The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate; and

c)  A reinforcing mesh that is embedded in a base coat applied to the insulation board; and

d)  A finish coat providing surface texture and color.

However, an "exterior insulation and finish system" does not include a cement-based, polymer-enhanced stucco cladding system which:

a)  Incorporates a weather -resistive barrier pursuant to applicable building codes ; and

b)  Incorporates ribbed insulation sheathing with ribs aligned vertically to provide drainage; and

c)  The manufacturer of the stucco components has a valid ICBO Evaluation Services Listing in good standing; and

d)  There is no mixing of different manufacturer's products for the stucco system

So long as that cement-based, enhanced stucco cladding system satisfies all requirements of the applicable model building code and the applicable local building code.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 4

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0016 00 03 04 ✓                                                   Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**ENGINEERS, ARCHITECTS OR
SURVEYORS PROFESSIONAL LIABILITY EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity.

All other terms and conditions of this policy remain unchanged.

Professional services include:

1.  The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

2.  Supervisory, inspection, architectural or engineering activities.

Endorsement Number:5

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001368 00

Named Insured:

Endorsement Effective Date:

00 CGL0039 00 12 02        Includes Copyright Material from Insurance Services Office
With Its Permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EARTH MOVEMENT OR SUBSIDENCE EXCLUSION**

This insurance does not apply to and we will not have the duty to investigate or defend any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of:

the subsidence, settling, sinking, slipping, falling away, caving in, shifting, eroding, consolidating, compacting, flowing, rising, tilting or any other similar movement of earth or mud, regardless of whether such movement is a naturally occurring phenomena or is man-made.

All other terms and conditions of this policy remain unchanged.

Endorsement Number: 6

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

02 CGL0011 00 10 02                                                                                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**INTELLECTUAL PROPERTY EXCLUSION**

This insurance does not apply to and we will not have the duty to investigate or defend any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of:

any "bodily injury", "property damage", or "personal and advertising injury" arising out of or directly or indirectly related to the actual or alleged publication or utterance or oral or written statements which are claimed as an infringement, violation or defense of any of the following rights or laws:

1.  copyright, other than infringement of copyrighted advertising materials;
2.  patent;
3.  trade secrets;
4.  trade dress; or
5.  trade mark or service mark or certification mark or collective mark or trade name, other than trademarked or service marked titles or slogans.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:7

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

02 CGL0018 00 10 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**SUPPLEMENTARY PAYMENTS REDUCE THE LIMITS OF INSURANCE:**
**DEDUCTIBLE POLICY ENDORSEMENT**

It is hereby understood and agreed that "SUPPLEMENTARY PAYMENTS – COVERAGES A AND B" within "SECTION I – COVERAGES", is amended as follows:

The provision:

"These payments will not reduce the limits of insurance."

is deleted in its entirety and is replaced with the following provision:

"These payments will reduce the limits of insurance."

It is hereby further understood and agreed that "SECTION III – LIMITS OF INSURANCE" is amended to include the following provision:

All Limits of Insurance are reduced by the payment of of those amounts set forth within "SUPPLEMENTARY PAYMENTS – COVERAGES A AND B" within "SECTION I – COVERAGES".

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 8

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001386 00

Named Insured:

Endorsement Effective Date:

00 CGL0136 00 01 04                                          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**APPLICATION AS WARRANTY CONDITION**

By acceptance of this policy, the Named Insured agrees that the statements in the application attached hereto and made part hereof, are true and correct representations, that each representation shall be deemed material, that this policy and all endorsements issued or to be issued are done so in reliance upon the truth of such representations.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:9

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0069 00 02 03

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**RESIDENTIAL AND RESIDENTIAL CONVERSION EXCLUSION**

This insurance does not apply to and we will have no duty to investigate or defend or provide coverage for any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of:

1.  the development or construction, in whole or in part, or existence of a non-commercial dwelling or residence; or,

2.  the development or construction of any building, in whole or in part, which has been converted, in whole or part, to a non-commercial dwelling or residence, at any time after the inception date of this insurance policy.

For purposes of this endorsement, non-commercial dwellings or residences shall include, but are not limited to, homes, cooperatives, town homes, lofts and condominiums.

However, this exclusion does not apply to the construction, management or ownership of apartment buildings, hotels or motels by you.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 10

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0080 00 07 04

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## RADON CONTAMINATION EXCLUSION

This insurance does not apply to and we will not have the duty to investigate or defend any suit brought against you, or pay any costs or expenses of such investigation and defense for liability, claims, damage or loss arising out of the presence, ingestion, inhalation or absorption of radon in any form.

All other terms and conditions of this policy remain unchanged.

Endorsement Number:11

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0066 00 02 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**NAMED INSURED ENDORSEMENT**

It is hereby agreed that Item 1. of the Declarations is amended to include the following entities as a Named Insured:
LEGACY BUILDING SERVICES, INC. AND ALL CONTRACTORS AND SUBCONTRACTORS IN THE OWNER CONTROLLED INSURANCE PROGRAM (OCIP)

All other terms and conditions of this policy remain unchanged.

Endorsement Number: 12

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0072 00 03 03

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**CONSTRUCTION PROJECT ENDORSEMENT**

Project Schedule

| | |
|---|---|
| 1. Name of Project: | MORENA VISTA MIXED USE DEVELOPMENT |
| 2. Term of Project: | 10/15/04 - 10/15/06 |
| 3. Description of Project: | 163 APARTMENT UNITS, 2 BUILDINGS, 4 STORIES IN HEIGHT, STEEL AND WOOD FRAME CONSTRUCTION; AND 22 LOFT APARTMENT UNITS, 1 BUILDING WITH FIRST LEVEL BEING COMMERCIAL USE, 3 STORIES IN HEIGHT, STEEL AND WOOD FRAME CONSTRUCTION |
| 4. Sponsor or Organizer of Project: | LEGACY BUILDING SERVICES, INC. |
| 5. Location of Project: | CROSS STREETS OF LINDA VISTA AND NAPA STREET, SAN DIEGO, CA 92110 |

A. This policy applies only to "bodily injury", "property damage", and "personal and advertising injury" arising out of construction operations at the project shown in the above Project Schedule.

B. "SECTION II – WHO IS AN INSURED" is amended to include only those licensed contractors enrolled in the project shown above by the sponsor or organizer, in writing, prior to any "occurrence" or offense for which coverage is sought under this policy.

C. Except with respect to the LIMITS OF INSURANCE, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

    1. As if each Named Insured were the only Named Insured; and

    2. Separately to each insured against whom claim is made or "suit" is brought.

D. The following exclusion is added to SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:

    This insurance does not apply to "property damage" to the project shown above or any part of the project shown above that occurs during the course of construction. The project shown above or part of the project shown above will be deemed to be within the course of construction until it satisfies the definition of "products-completed operations hazard" as defined in this endorsement.

E. The definition of "products-completed operation hazard" is deleted and replaced by the following:

    1. "Products-completed operations hazard" includes all "bodily injury" and "property damage" arising out of "your product" or "your work" except:

        a. Products that are still in your physical possession; or

        b. Work that has not yet been completed or abandoned.

    2. "Your work" will be deemed completed at the earliest of the following times:

        a. Completion and acceptance of the entire project shown above by all parties designated in its construction agreement;

00 CGL0110 00 08 04

Page 1 of 2

    c.  When that part of the work done at the project shown above has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

F.  Insurance for "bodily injury" and "property damage" included in the "products – completed operations hazard" is subject to a limited policy period extension as follows:

    1.  Solely with respect to liability for "bodily injury" or "property damage" included in the "products – completed operations hazard", the insurance provided by this policy is extended for an additional period of time. This coverage extension will commence at the time that "your work" is deemed to be completed, as described in subparagraph E. 2. of this endorsement. The coverage extension period will be equal to the applicable statute of limitations for any claim or "suit" for such "bodily injury" or "property damage" as provided by the controlling law of the jurisdiction where the claim or "suit" is brought or filed. However, such extension will not exceed ten (10) years from the date "your work" is completed as defined in subparagraph E. 2.of this endorsement.

    2.  The LIMITS OF INSURANCE for the policy period continue to apply and are not separate or different from, increased with respect to, or reinstated for, the extension referred to in Section F. 1.above.

    3.  If this policy is cancelled by you for any reason, or by us for non-payment of premium, prior to the point in time that "your work" is deemed to be complete (as described in subparagraph E. 2. of this endorsement) then the "products – completed operations hazard" extension described herein will not apply.

    4.  We may cancel the insurance provided by the coverage extension described herein if you fail to pay any additional premium due to us as determined by a premium audit.

G.  Paragraph 4. Other Insurance of SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS is deleted and replaced by the following:

    This insurance is primary and non-contributory with respect to the project shown above, unless other insurance is written specifically to apply to the same project on a primary basis, in which case this insurance will share in equal shares with that other insurance.

H.  COVERAGE C MEDICAL PAYMENTS in SECTION I COVERAGES is hereby deleted in its entirety.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 13

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0110 00 08 04                                             Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

**PREMIUM COMPUTATION ENDORSEMENT – DEDUCTIBLE POLICY VERSION**

1. The Deposit Premium set forth in of the Declarations is adjustable, and is only an estimated premium for the Audit Period shown below.

The final earned premium for the Audit Period shall be determined as specified in Item **5. Premium Audit** of **SECTION IV – Commercial General Liability Conditions.** The Audit Premium shall be computed by applying the Rate of  $32.20 per each $1,000  of the Premium Base identified in 2. below.  Such Rate is net of any taxes, licenses, or fees.  The final premium calculation is subject to the Minimum Retained Premium as stated in the Declarations.

2. The Premium Base shall be identified in (A) and (B) below:

    (A)  PREMIUM BASE

          ☐  gross "sales" excluding "aircraft products"

                ☐  "intercompany sales" and

                ☐  "foreign sales".

          ☐  "Payroll" as determined immediately below:

                ☐  Gross Unmodified "Payroll"

                ☐  Workers Compensation Payroll"

                ☐  Workers Compensation Payroll" excluding:

                    (1)  "Clerical Office Employees"
                    (2)  "Salesmen, Collectors, Messengers"
                    (3)  Drivers and their helpers if principal duties are to work on or in
                          connection with "autos"

          ☒  Other (Describe)    <u>CONSTRUCTION COSTS</u>

             Estimated Exposures    _____

    (B)  SPECIFIC DELETIONS FROM PREMIUM BASE, IF ANY:

          ☐  Designated Products described in the following endorsements:

          ☐  Designated Operations described in the following endorsements:

          ☐  Other, described in the following endorsements

3. The Audit Period is:

☐ Annual

☐ Semi-Annual

☐ Monthly

☒ Other

4. The Audit Period is measured from the Effective Date of the Insurance Policy.

All other terms and conditions of this policy remain unchanged.

Endorsement Number: 14

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

02 CGL0107 00 09 03                                                                    Page 2 of 2

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**DEDUCTIBLE LIABILITY ENDORSEMENT**

**Schedule**

1. Specific coverages to which a deductible(s) applies and amount of deductible(s):

   <u>Coverage</u>                                                <u>Amount of Deductible</u>

   ☒ All coverages............................................................$ 25,000
   ☐ Products/Completed Operations..........................................$ _____
   ☐ All coverages other than Products/Completed Application................$ _____

2. The deductible applies to:

   ☒ Indemnity and Expenses
   ☐ Indemnity Only

3. A deductible aggregate applies as follows:

   ☐ The deductible aggregate amount for all coverages, which is the maximum amount of deductible payments for which the insured is responsible, is: $ _____.  The deductible aggregate is subject to adjustment upwards based on a rate of $ _____ per 1000 _____.  Once the loss payments actually paid by us, and reimbursed by the insured to us, equals the deductible aggregate amount, the insured's deductible will be reduced to $ _____.  The estimated exposure base, at inception, is $ _____.

   (If no aggregate is shown, then there is no aggregate on the cumulative amount of deductible payments for which the insured is responsible.)

Application of the Deductible Liability Endorsement

The deductible(s) set forth in the Schedule apply to indemnity and expenses, (or indemnity only if the appropriate box is checked in the Schedule), on a "per occurrence" basis.  The insured is responsible for payment of the deductible(s).

The insured is responsible for all payments within the deductible amount.  Subject to the Limits of Liability and all other terms and conditions for this policy, our obligation to pay damages and expenses on your behalf applies only to the amount of damages and expenses in excess of the deductible amounts set forth in the Schedule.  We may pay part or the entire deductible amount to effect settlement of any "claim" or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount that has been paid by us.

Our limits of liability are not increased by the presence of a deductible.

All other terms and conditions of this Policy remain unchanged.

Endorsement Number: 15

This endorsement is effective on the inception date of this policy unless otherwise stated herein.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Policy Number: GAC 0001366 00

Named Insured:

Endorsement Effective Date:

00 CGL0099 00 10 03                                                              Page 1 of 1

**EXHIBIT B**

STEWART SMITH WEST
535 NORTH BRAND BOULEVARD,  SUITE 800
GLENDALE, CA 91203
ATTN:  ED PERDOMO

EXECUTIVE OFFICES:
70 Pine Street
New York, New York 10270

# THE INSURANCE COMPANY OF
# THE STATE OF PENNSYLVANIA

A CAPITAL STOCK COMPANY INCORPORATED 1794

*Philadelphia, Pa.*

Renews _____ **NEW** _____

Policy Number _____ **4204-2006** _____

## DECLARATIONS

NAMED INSURED:   **LEGACY BUILDING SERVICES, INC.**
**(AND AS SHOWN IN SCHEDULED UNDERLYING INSURANCE)**

ADDRESS:     **2505 CONGRESS STREET**
**SAN DIEGO, CA 92110**

POLICY PERIOD:    **OCTOBER 15, 2004  TO  OCTOBER 15, 2006  (12:01 A.M. STANDARD TIME AT
THE ADDRESS OF THE NAMED INSURED AS STATED ABOVE)**

COVERAGE:     **FOLLOWING FORM EXCESS LIABILITY**

LIMIT OF LIABILITY:   **$2,000,000 EACH OCCURRENCE/ANNUAL AGGREGATE, WHERE APPLICABLE
EXCESS OF UNDERLYING.**

PREMIUM:     **$90,600 MINIMUM AND DEPOSIT PREMIUM**
**$22,650 MINIMUM EARNED PREMIUM**

RATE:     **$3.0712 PER $1,000 OCP COSTS**
**ESTIMATED EXPOSURE:  $29,500,000**

AUDIT: POLICY TERM

**RECEIVED**

UNDERLYING POLICY(IES) NO.:   **SEE SCHEDULE OF UNDERLYING INSURANCE**

SEP. 2 2 2004

ISSUED BY:     **SEE SCHEDULE OF UNDERLYING INSURANCE**

WILLIS RISK & INSURANCE SERVICES

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and Secretary
at New York, New York and countersigned by a duly authorized representative of the Company.

*Elizabeth M. Tuck*
Secretary

*Jeff W Guby*
President

Countersigned by: _____

Authorized Representative

September 14, 2004
DM/bd

C. V. STARR & COMPANY
UNDERWRITING MANAGERS

44382 (9/86)

Order by 44382 LAS  (5/94

EXCESS LIABILITY POLICY
# THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA
(Hereinafter called the Company)

Agrees with the named Insured, in consideration of the payment of the premium and subject to all of the terms of this Policy, as follows:

As respects accidents or occurrences, whichever is applicable, taking place during the period of the Policy, the Company agrees to afford the Insured such additional Insurance as the Issuers of the Underlying Coverage specified in the schedule would afford the Insured by increasing the underlying limit combined provided that it is expressly agreed that liability shall attach to the Company:

(a) only after the Issuers of the Underlying Coverage have paid or have been held liable to pay the full amount of the said underlying limit, and

(b) only as respects such additional amounts in excess thereof as would be payable by the Issuers of the Underlying Coverage if the said underlying limit were amended as aforesaid, and

(c) in no greater amount than the limit(s) set forth under the Declarations ultimate net loss as respects each accident or occurrence, whichever is applicable, taking place during the period of this policy-Subject to the limit(s) set forth under the Declarations ultimate net loss in the aggregate where applicable for each annual period during the currency of this Policy.

## DEFINITIONS

1. Ultimate Net Loss. The words "ultimate net loss" shall be understood to mean the amount payable in settlement of the liability of the Insured after making deductions for all recoveries for other valid and collectible insurances, excepting however the policy(ies) of the Primary Insured(s) and shall exclude all expenses and Costs.

2. Costs. The word "costs" shall be understood to mean interest accruing after entry of judgement, investigation, adjustment and legal expenses (excluding, however, all office expenses of the Insured, all expenses for salaried employees of the Insured, and general retainer fees for counsel normally paid by the Insured).

## CONDITIONS

1. MAINTENANCE OF UNDERLYING INSURANCE. It is a condition of this Policy that the Underlying Coverage be maintained in full effect during the period of this Policy except for the reduction of the aggregate limits contained therein solely by payment of claims for accidents or occurrences, whichever is applicable, which take place during the period of this Policy. If the Underlying Coverage is terminated during the period of the Policy the effective date of termination of the said Underlying Coverage shall be the end of the period of this Policy.

This Policy is subject to the same warranties, terms and conditions (except as otherwise provided herein) as are contained in or as may be added to the Underlying Coverage prior to the happening of an accident or occurrence, whichever is applicable, for which claim is made hereunder. It is further understood and agreed that any changes made in the Underlying Coverage will automatically be covered under this Policy from the time such changes take effect in the said underlying Policy provided, however, that any material change be reported to the Company within thirty (30) days of such change. Such changes may be reported to the Company c/o C.V. Starr & Co., Three Embarcadero Center, San Francisco, Ca. 94111.

2. PREMIUM. The Insured shall pay premium to the Company as specified in the schedule.

If the Insured terminates this Policy, earned premium shall be computed in accordance with the customary short rate table and procedure. If the Company terminates this Policy, earned premium shall be computed pro rata.

3. NOTIFICATION OF CLAIMS: The Insured upon knowledge-of-any-accident or occurrence likely to give rise to a claim hereunder shall give immediate written notice thereof to the Company. Such notice may be reported to the Company c/o C.V. Starr & Co., Three Embarcadero Center, San Francisco, Ca. 94111.

4. ASSISTANCE AND COOPERATION. The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured but the Company shall have the right and shall be given the opportunity to associate with the Insured or the Insured's underlying Insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Company, in which event the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding.

5. CANCELLATION. This Policy may be cancelled by the Insured by mailing to the Company written notice stating when such cancellation shall be effective. This Policy may be cancelled by the Company by mailing to the Insured at the address shown in this policy written notice stating when not less than thirty (30) days thereafter such cancellation shall be effective, except for non-payment of any premium, the Company shall provide ten (10) days notice in the event of cancellation. The mailing of notice as aforesaid shall be sufficient

proof of notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the Insured or by this Company shall be equivalent to mailing.

## EXCLUSIONS

This Policy shall not apply:

1. to personal injury or property damage

(i) with respect to which an Insured under the Policy is also an Insured under a Nuclear Energy Liability Policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such Policy but for its termination upon exhaustion of its limit of liability; or

(ii) resulting from the hazardous properties of nuclear material and with respect to which

(A) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

(B) the Insured is, or had this Policy not been issued, would be entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization; or

(iii) resulting from the hazardous properties of nuclear material, if

(A) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (2) has been discharged or dispersed therefrom; or

(B) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

(C) the injury, sickness, disease, death or destruction arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this subparagraph (C) applies only to injury to or destruction of property of such a nuclear facility.

As used herein "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under subparagraph (A) or (B) thereof; "nuclear facility" means

(A) any nuclear reactor,

(B) any equipment or device designed or used for (1) separating the isotopes uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(C) any equipment or device used for the processing, fabrication or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(D) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material; with respect to injury to or destruction of property, the words "injury" or "destruction" include all forms of radioactive contamination of property; or

(iv) with respect to liability arising outside the United States of America, its territories or possessions, Puerto Rico or the Canal Zone, to any liability of whatsoever nature directly or indirectly caused by, or contributed to by or arising from ionising radiations or contamination by radioactive from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

2. To any claim based upon the Insured's failure to comply with federal "Employee Retirement Income Security Act of 1974", or any amendment thereto.

In Witness Whereof, the Company has caused this Policy to be executed and attested; but this Policy shall not be valid unless countersigned on this Declarations page by a duly authorized representative of the Company.

## FORMS SCHEDULE

**Named Insured:**      LEGACY BUILDING SERVICES, INC.

**Policy Number:**      4204-2006

**Effective 12:01 AM:**      OCTOBER 15, 2004

| End't. No. | Form Name | Form Number/ Edition Date |
|---|---|---|
| | Excess Liability Declarations Page | 44382 (8/86) |
| | Schedule of Underlying Insurance | MNSCPT |
| 1 | Terrorism Exclusion | MNSCPT |
| 2 | California Amendatory Endorsement for Cancellation and Nonrenewal | 52133 (3/94) |
| 3 | Amendment of Definition | MNSCPT |
| 4 | Notice of Occurrence | MNSCPT |
| 5 | Premium Reporting Endorsement | MNSCPT |
| 6 | Fungus Exclusion | MNSCPT |
| 7 | Coverage Territory Limitation Endorsement | MNSCPT |

## SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF POLICY OR COVERAGE | LIMITS OF LIABILITY |
|---|---|
| **Commercial General Liability** | Bodily Injury and Property Damage Combined Single Limit |
| Carrier: ARCH SPECIALTY INSURANCE COMPANY<br>Policy No.: TBD<br>Policy Term: 10/15/04 TO 10/15/06<br><br>*See endt 1* | $5,000,000  Each Occurrence<br>$5,000,000  General Aggregate<br>         (Other than Products/Completed Operations)<br><br>(Applicable if marked)<br>☒ Per Location<br>☒ Per Project |
| **Products/Completed Operation Liability** | Bodily Injury and Property Damage Combined Single Limit |
| Carrier: ARCH SPECIALTY INSURANCE COMPANY<br>Policy No.: TBD<br>Policy Term: 10/15/04 TO 10/15/06 | $5,000,000 Each Occurrence<br>$5,000,000 Annual Aggregate |

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED

Effective date of this endorsement is: OCTOBER 15, 2004

Attached to and forming part of Policy No. 4204-2006

Issued to: LEGACY BUILDING SERVICES, INC.

Dated: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C. V. STARR & CO.
Underwriting Managers

By _____

## ENDORSEMENT NO. 1

### Commercial Excess Liability Policy Form

### TERRORISM EXCLUSION

This insurance does not apply to loss arising directly or indirectly as a result of a certified "act of terrorism" defined by Section 102. Definitions., of the Terrorism Risk Insurance Act of 2002 and any revisions or amendments.

For purposes of this endorsement and in compliance with the Terrorism Risk Insurance Act of 2002, an "Act of Terrorism" shall mean:

(1) "Act of Terrorism":
(A) Certification. – The term "Act of Terrorism" means any act that is certified by the Secretary of the Treasury of the United States, in concurrence with the Secretary of State, and the Attorney General of the United States:
    (i) To be an "Act of Terrorism";
    (ii) To be a violent act or an act that is dangerous to:
        (I) Human life;
        (II) Property; or
        (III) Infrastructure;
    (iii) To have resulted in damage within the United States, or outside of the United States in the case of:
        (I) An air carrier or vessel described in paragraph (5)(B); [for the convenience of this endorsement, paragraph (5)(B) reads: occurs to an air carrier (as defined in Section 40102 of title 49, United States Code) to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs, or at the premises of any United States mission];
        (II) the premises of a United States mission; and
    (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or effect the conduct of the United States Government by coercion.
(B) Limitation: No act shall be certified by the Secretary as an "Act of Terrorism" if:
    (i) The act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
    (ii) Property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.
(C) Determinations Final: Any certification of, or determination not to certify, an act as an "Act of Terrorism" under this paragraph shall be final, and shall not be subject to judicial review.
(D) Nondelegation: The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an "Act of Terrorism" has occurred.

All other terms and conditions remain unchanged

Effective date of this endorsement is:  OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

Issued to:  LEGACY BUILDING SERVICES, INC.

Date:  September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

By: _____

## ENDORSEMENT NO. 1

## ENDORSEMENT NO. 2

### CALIFORNIA CANCELLATION/NONRENEWAL ENDORSEMENT

#### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is hereby understood and agreed that the cancellation clause is replaced with the following:

#### CANCELLATION

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than ninety (90) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

(1)   Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

(2)   A judgement by a court or an administrative tribunal that the named insured has violated any law of this state of or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

(3)   Discovery of fraud or material misrepresentation by either of the following:

    a)   The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

    b)   The named Insured or his or her representative in pursuing a claim   under the policy.

(4)   Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

(5)   Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy

All other terms and conditions remain unchanged

Effective date of this endorsement is:  OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

Issued to:  LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Manager

By:

### ENDORSEMENT NO. 2

Page 1 of 3

52133 (3/94)
CVO215

## ENDORSEMENT NO. 2

issuance or which were conditions precedent to the use by the insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

(6)    A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the insurer.

(7)    A determination by the commissioner that a continuation of the policy coverage could place the insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the insurer.

(8)    A change by the named insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the named insured at least thirty (30) days prior to the effective date of cancellation. Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

NONRENEWAL

If the insurer decides not to renew the policy, the insurer shall mail or deliver to the producer of record and the named insured notice of nonrenewal at least ninety (90) days but no more than 120 days prior to the end of the policy period. The notice shall contain the reason for nonrenewal of the policy.

RENEWAL

If a policy has been in effect for more than ninety (90) days or if the policy is a renewal, effective immediately no increase in premium, reduction in limits, or change in the conditions of coverage shall be effective during the policy period unless based upon one of the following reasons:

(1)    Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards by the named insured or Other Insured(s) which materially increase any of the risks or hazards insured against.

(2)    Failure by the named insured or Other Insured(s) to implement reasonable loss control requirements which were agreed to by the insured as a condition of policy issuance or which were conditions precedent to the use by the insurer of a particular rate or rating plan, if the failure materially increases any of the risks insured against.

All other terms and conditions remain unchanged

Effective date of this endorsement is: OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

Issued to: LEGACY BUILDING SERVICES, INC.

C.V. STARR & CO.
Underwriting Managers

Date: September 14, 2004                    By:

## ENDORSEMENT NO. 2

Page 2 of 3

52133 (3/94)
CV0215

## ENDORSEMENT NO. 2

(3)   A determination by the commissioner that loss of or changes in an insurer's reinsurance covering all or part of the risk covered by the policy would threaten the financial integrity or solvency of the insurer unless the change in the terms or conditions or rate upon which the premium is based is permitted.

(4)   A change by the named Insured or Other Insured(s) in the activities or property of the commercial or industrial enterprise which results in a materially added risks, a materially increased risk, or materially changed risk, unless the added, increased, or changed risk is included in the policy.

Written notice shall be mailed or delivered to the named insured and the producer of record at least thirty (30) days prior to the effective date of any increase, reduction or change.

All other terms and conditions remain unchanged

Effective date of this endorsement is: OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

Issued to: LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

By:

## ENDORSEMENT NO. 2

Page 3 of 3

52133 (3/94)
CV0215

## ENDORSEMENT NO. 3

## AMENDMENT OF DEFINITION

IT IS AGREED THAT DEFINITION 1.   ULTIMATE NET LOSS IN EXCESS LIABILITY POLICY FORM 44382 (8/86) IS AMENDED TO READ:

1.   ULTIMATE NET LOSS.   THE WORDS "ULTIMATE NET LOSS" SHALL BE UNDERSTOOD TO MEAN THE AMOUNT PAYABLE IN SETTLEMENT OF THE LIABILITY OF THE INSURED AFTER MAKING DEDUCTIONS FOR ALL RECOVERIES FOR OTHER VALID AND COLLECTIBLE INSURANCES, EXCEPTING HOWEVER THE POLICY(IES) OF THE PRIMARY INSURER(S), AND SHALL INCLUDE ALL COSTS.

All other terms and conditions remain unchanged

Effective date of this endorsement is:  OCTOBER 15, 2004

Attached to and forming part of No.  4204-2006

Issued to:  LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

By:_____

ENDORSEMENT NO. 3

**ENDORSEMENT NO. 4**

<u>NOTICE OF OCCURRENCE</u>

IT IS AGREED THAT CONDITION III OF FORM 44382 (8/86) (NOTIFICATION OF CLAIMS) IS DELETED IN ITS ENTIRETY AND REPLACED BY THE FOLLOWING:

WHENEVER THE INSURED HAS INFORMATION FROM WHICH THE INSURED MAY REASONABLY CONCLUDE THAT AN OCCURRENCE COVERED HEREUNDER INVOLVES INJURIES OR DAMAGES, WHICH, IN THE EVENT THAT THE INSURED SHOULD BE HELD LIABLE, IS LIKELY TO INVOLVE THIS POLICY, NOTICE SHALL BE SENT TO:

C.V. STARR CLAIMS, NY
175 WATER STREET, 22ND FLOOR
NEW YORK, NY 10038

AS SOON AS PRACTICABLE, PROVIDED, HOWEVER, THAT FAILURE TO GIVE NOTICE OF ANY OCCURRENCE WHICH, AT THE TIME OF ITS HAPPENING, DID NOT APPEAR TO INVOLVE THIS POLICY BUT WHICH, AT A LATER DATE, WOULD APPEAR TO GIVE RISE TO CLAIMS HEREUNDER, SHALL NOT PREJUDICE SUCH CLAIMS.

All other terms and conditions remain unchanged

Effective date of this endorsement is: OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

Issued to: LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

By: _____

**ENDORSEMENT NO. 4**

## ENDORSEMENT NO. 5

### PREMIUM REPORTING ENDORSEMENT

PREMIUMS DESIGNATED IN THIS POLICY ARE MINIMUM AND DEPOSIT PREMIUMS ONLY WHICH SHALL BE CREDITED TO THE AMOUNT OF THE EARNED PREMIUM DUE AT THE END OF THE POLICY PERIOD. AT THE CLOSE OF EACH PERIOD (OR PART THEREOF TERMINATING WITH THE END OF THE POLICY PERIOD) DESIGNATED IN THE DECLARATIONS AS THE AUDIT PERIOD, THE EARNED PREMIUM SHALL BE COMPUTED FOR SUCH PERIOD AND, UPON NOTICE THEREOF TO THE NAMED INSURED, SHALL BECOME DUE AND PAYABLE. THE MINIMUM PREMIUM SHOWN ON THE DECLARATIONS PAGE IS THE MINIMUM PREMIUM FOR PROVIDING COVERAGE FOR THE POLICY TERM. ANY PREMIUM REPORTING PROVISIONS CONTAINED IN THE POLICY COVERAGE PARTS IN CONFLICT WITH THIS ENDORSEMENT ARE DELETED.

THE DEPOSIT PREMIUM IS ADJUSTABLE ANNUALLY AT A RATE OF $3.0712 PER $1,000 OF OCP COSTS.

THE NAMED INSURED SHALL MAINTAIN RECORDS OF SUCH INFORMATION AS IS NECESSARY FOR PREMIUM COMPUTATION, AND SHALL MAKE AVAILABLE COPIES OF SUCH RECORDS TO THE COMPANY AT THE END OF THE POLICY PERIOD AND AT SUCH TIME DURING THE POLICY PERIOD AS THE COMPANY MAY DIRECT. IF ANY OPERATIONS ARE UNDERTAKEN BY THE INSURED THAT ARE NOT DESCRIBED IN SAID DECLARATIONS, SUCH OPERATIONS, UNLESS EXCLUDED FROM THIS POLICY BY DECLARATIONS OR BY OTHER WRITTEN AGREEMENTS, SHALL BE DEEMED TO COME WITHIN THE PROVISIONS OF THE POLICY AND THE INSURED AGREES TO PAY A PREMIUM THEREON, AT THE TIME OF THE FINAL ADJUSTMENT OF THE PREMIUM AT RATES TO BE DETERMINED.

OCP COSTS DEFINED AS FOLLOWS:

1. THE COSTS OF ALL LABOR, MATERIALS AND EQUIPMENT FURNISHED, USED OR DELIVERED FOR USE IN THE EXECUTION OF THE WORK; AND

2. ALL FEES, BONUSES OR COMMISSIONS MADE, PAID OR DUE.

All other terms and conditions remain unchanged

Effective date of this endorsement is:  OCTOBER 15, 2004

Attached to and forming part of No.  4204-2006

Issued to:  LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Manager

By:

## ENDORSEMENT NO. 5

### ENDORSEMENT NO. 6

### COMMERCIAL EXCESS LIABILITY POLICY
### FUNGUS EXCLUSION

The Exclusions section is amended by adding the following exclusion to the policy:

This insurance does not apply to "bodily injury", "property damage", "personal injury", "advertising injury" or any other loss, injury, damage, cost or expense, including , but not limited to, losses, costs or expenses related to, arising from or associated with clean-up, remediation, containment, removal or abatement, caused directly or indirectly, in whole or in part, by:

    a.  Any "fungus(i)", molds(s), mildew or yeast, or

    b.  Any "spore(s)" or toxins created or produced by or emanating from such fungus(i), mold(s), mildew or yeast, or

    c.  Any substance, vapor , gas, or other emission or organic or inorganic body or substance produced by or arising out of any "fungus(i)" , "mold(s)", mildew or yeast, or

    d.  Any material, product, building component, building or structure, or any concentration of moisture, water or other liquid within such material, product, building component, building or structure, that contains, harbors, nurtures or acts as a medium for any "fungus(i)" , mold(s), mildew, yeast, or "spore(s)" or toxins emanating therefrom,

regardless of any other cause, event, material, product and/or building component that contributed concurrently or in any sequence to that loss, injury ,damage, cost or expense.

For the purposes of this exclusion, the following definitions are added to the Policy:

"Fungus(i)" includes, but is not limited to, Any of the plants or organisms belonging to the major group Fungi, lacking chlorophyll, and including molds, rusts, mildews, smuts and mushrooms.

    "Mold(s)" includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce molds.

    "Spore(s)" means any dormant or reproductive body produced by or arising or emanating out of any "fungus(i)", "mold(s)', mildew, plants, organisms or microorganisms.

(1/02)

All other terms and conditions remain unchanged

Effective date of this endorsement is:  OCTOBER 15, 2004

Attached to and forming part of No.  4204-2006

Issued to:  LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004         By:

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

### ENDORSEMENT NO. 6

# ENDORSEMENT NO. 7

## COVERAGE TERRITORY LIMITATION ENDORSEMENT

The **CONDITIONS** are amended to include the following:

### COVERAGE TERRITORY

Any claims or suits for damages occurring within the coverage territory must be brought within the United States of America, its territories or possessions, or in Canada.

Coverage Territory shall be deemed to mean anywhere in the world with the exception of any country or jurisdiction which is subject to trade or other economic sanction or embargo by the United States of America.

All other terms and conditions remain unchanged

Effective date of this endorsement is: OCTOBER 15, 2004

Attached to and forming part of No. 4204-2006

Issued to: LEGACY BUILDING SERVICES, INC.

Date: September 14, 2004

THE INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

C.V. STARR & CO.
Underwriting Managers

By:_____

**ENDORSEMENT NO. 7**

ENDORSEMENT NO. 9

POLICY EXTENSION ENDORSEMENT

Your policy period has been extended to read: October 15, 2004 to December 15, 2006.

Additional Premium to be Determined at Final Audit.

All other terms and conditions remain unchanged.

Effective date of this endorsement is:  November 14, 2006.

Attached to and forming part of No.: 4204-2006

Issued to:    Legacy Building Services, Inc

Dated:     November 30, 2006                          By:

THE  INSURANCE  COMPANY  OF
THE STATE OF PENNSYLVANIA

ENDORSEMENT NO. 9

**EXHIBIT C**

**EXHIBIT C**

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2014 JAN -6 P 3: 22

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1 | Andrew A. Kurz, SBN 61801
LAW OFFICES OF ANDREW A. KURZ
2 | 120 Birmingham Drive, Suite 200
Cardiff, CA 92007
3 | Tel: (760) 633-1616
Fax: (760) 633-1613
4
5 | Attorneys for Defendant 2505 Congress, Inc.

JAN 6 PM 2:59

6
7 |                SUPERIOR COURT OF THE STATE OF CALIFORNIA
8 |                     FOR THE COUNTY OF SAN DIEGO
9

10 | In the Matter of the Confession of          )   Case No.
   | Judgment by                                 )   37-2014-00082269-CU-EN-CTL
11 |                                             )   CONFESSION OF JUDGMENT
   | 2505 CONGRESS, INC., formerly known         )   STATEMENT
12 | as LEGACY BUILDING SERVICES,                )
   | INC.,                                       )   [Cal. Code Civ. Proc. § 1133]
13 |                                             )
   |                            Defendant,       )
14 | In Favor of                                 )
   |                                             )
15 | MORENA VISTA, LLC,                          )
   |                                             )
16 |                            Plaintiff.       )

17 |        2505 Congress, Inc., formerly known as Legacy Building Services, Inc. ("Legacy"), hereby

18 | confesses judgment in the above-entitled cause in favor of Morena Vista, LLC ("Morena Vista") in

19 | the sum of $10,500,000.00 and authorizes entry of judgment against it in that sum accordingly.

20 |        This Confession of Judgment is for the purpose of securing a contingent liability, and arises

21 | out of the following facts:

22 |        1.      Morena Vista is the owner of record of a mixed-use development commonly referred

23 | to as The Village at Morena Vista located at 5175 Linda Vista Road and 5375 & 5395 Napa Street in

24 | San Diego consisting of 3 buildings with 163 apartments, 22 lofts, and 18,814 sq. ft. of net leasable

25 | retail space ("the Project"). On September 1, 2004, Morena Vista Development, LLC (Morena

26 | Vista's managing entity) entered into a written agreement entitled Design-Build Agreement On Site

27 | and General Conditions ("Contract") with Legacy to design and construct the Project.

28 | ///

1

2.     On September 22, 2011, Morena Vista filed a Demand for Arbitration with JAMS (Judicial Arbitration and Mediation Services) against Legacy entitled *Morena Vista, LLC v. Legacy Building Services, Inc.*, JAMS Reference No. 1240020571 (the "Arbitration Action"), asserting causes of action for breach of contract, breach of express/implied warranties, and negligent design and construction of the Project. Therein, Morena Vista alleges that during the rainy season in late 2010 and early 2011, it discovered significant water intrusion at the Project. Among other things, Morena Vista contends that the Project experienced significant water intrusion within the common area amenities including the plaza deck, pool deck, and planters. Further, Morena Vista contends that water bypassed the structural podium slab and travelled into the subterranean garage below, causing further property damage along the way. Additionally, Morena Vista contends that water intrusion: (1) within unit balconies at the lofts in Buildings A & B and at the apartments at Building C, (2) sliding glass doors and stucco base wall terminations, and (3) into adjacent and sub-adjacent living spaces caused resulting property damage. Furthermore, Morena Vista contends that water intrusion caused extensive property damage to the balcony storage closets at Building C. Moreover, Morena Vista contends that water intrusion caused property damage at the store-front windows in the retail spaces at Buildings A & B, plumbing pipe defects resulted in backups and other property damage at all three buildings, and other defects are present at Buildings A & B. Finally, Morena Vista contends that certain limited repairs made by Legacy and various subcontractors, including TEG, in 2011 were not conducted in a manner consistent with industry standards.

3.     In the Arbitration Action, Morena Vista contends that it has sustained physical damage to the Project arising from construction defects which will cost in excess of $12.6 million to repair. Morena Vista's claimed damages also include an estimated $2.1 million in (a) *Stearman* Costs; (b) costs associated with temporary and permanent repairs performed to date; (c) increased operating expenses; (d) lost value of services; (e) other economic losses including tenant concessions; (f) attorneys fees; (g) prejudgment interest; and (h) other business interruption, additional overhead, management expense, etc. Moreover, Morena Vista contends in the Arbitration Action that it has incurred, and will incur in the future, loss of rental income in a sum potentially exceeding $1.1 million. Finally, the prejudgment interest claimed on Morena Vista's out-of-pocket

2

expenditures (averaged at 2 years) is $400,000. Morena Vista's claimed total damages exceed $16.1 million. Recently, Legacy and Morena Vista agreed to settle approximately $3.4 million of Morena Vista's damages claim attributable to certain construction and/or design defects allegedly not covered by Legacy's commercial general liability insurance. Accordingly, the total damages sought in the Arbitration Action which were not settled exceed $12.7 million.

4.      Legacy has evaluated Morena Vista's claims against Legacy for damages, including Legacy's liability and the total value of Morena Vista's claim. Legacy acknowledges that it is liable to Morena Vista, and believes that if the Arbitration Action were to be arbitrated and an award entered, the award would be in excess of $10.5 million (not including claims that were previously settled).

Dated: December 27, 2013          LAW OFFICES OF ANDREW A. KURZ

By:    _____
       Andrew A. Kurz
       Attorney for 2505 Congress, Inc., formerly known
       as Legacy Building Services, Inc.

<u>VERIFICATION</u>

I, William Kittredge, am the Vice President of defendant 2505 Congress, Inc., formerly known as Legacy Building Services, Inc., in the above-entitled cause. I have read the foregoing CONFESSION OF JUDGMENT STATEMENT and know the contents thereof. The same is true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed this 24th day of December, 2013, at San Diego, California.

_____
William Kittredge

3

FILED
CIVIL BUSINESS OFFICE 9
CENTRAL DIVISION

2014 JAN -6  P 3: 22

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1 | Andrew A. Kurz, SBN 61801
LAW OFFICES OF ANDREW A. KURZ
2 | 120 Birmingham Drive, Suite 200
Cardiff, CA 92007
3 | Tel: (760) 633-1616
Fax: (760) 633-1613
4

5 | Attorneys for Defendant 2505 Congress, Inc.                          JAN 6 PM 2:59

6

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF SAN DIEGO**

10

11 | In the Matter of the Confession of ) Case No.
Judgment by                        ) 37-2014-00082269-CU-EN-CTL
12 |                                    ) **ATTORNEY'S CERTIFICATE IN**
2505 CONGRESS, INC., formerly known ) **SUPPORT OF CONFESSION OF**
13 | as LEGACY BUILDING SERVICES,       ) **JUDGMENT STATEMENT**
INC.,                              )
14 |                                    )
Defendant, ) [Cal. Code Civ. Proc. § 1132(b)]
15 | In Favor of                        )
                                   )
16 | MORENA VISTA, LLC,                 )
                                   )
17 |                      Plaintiff.    )

18

19 |         I, Andrew A. Kurz, declare that:

20 |         1.      I am an attorney licensed to practice in the State of California.  I represent 2505

21 | Congress, Inc, formerly known as Legacy Building Services, Inc., in connection with claims made

22 | against it by Morena Vista, LLC, arising out of construction of the mixed-use development

23 | commonly referred to as "The  Village at Morena Vista."  I have personal knowledge of the facts set

24 | forth in this declaration, and if called as a witness in this matter, I could and would testify

25 | competently to those facts.

26 | //

27 | //

28 |

1

2.    I have examined the proposed judgment, and have advised 2505 Congress, Inc. with respect to the waiver of rights and defenses under the confession of judgment procedure.  I have advised 2505 Congress, Inc. to utilize the confession of judgment procedure.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on December 27, 2013, at Cardiff, California.

Andrew A. Kurz

2

F I L E D
Clerk of the Superior Court

JAN 0 7 2014

By: M. SCOTT, Deputy

JHN 6 PH 2:59

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| In the Matter of the Confession of Judgment by<br><br>2505 CONGRESS, INC., formerly known as LEGACY BUILDING SERVICES, INC.,<br><br>      Defendant,<br><br>In Favor of<br><br>MORENA VISTA, LLC,<br><br>      Plaintiff. | Case No.<br> 37-2014-00082269-CU-EN-CTL<br>**JUDGMENT**<br><br>[Cal. Code Civ. Proc. § 1134] |

Pursuant to the Confession of Judgment Statement on file herein, the above-titled court ordered the following judgment to be entered in this action:

  IT IS ADJUDGED, ORDERED AND DECREED that plaintiff Morena Vista, LLC recover from defendant 2505 Congress, Inc., formerly known as Legacy Building Services, Inc., the following:

  1. Principal in the amount of $10,500,000; and

  2. Costs in the amount of $_____N/A_____.

Dated: JAN 0 7 2014     M. Scott

             Clerk of the Court

     By:   M. Scott
            Deputy

1

# EXHIBIT B

# EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

FILED
BUSINESS OFFICE 17
CENTRAL DIVISION

14 JUL 11 PM 3:04

CLERK SUPERIOR COURT
SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:** Insurance Company of the State of
*(AVISO AL DEMANDADO):* Pennsylvania, a Pennsylvania
corporation; and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:** Morena Vista, LLC, a
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* California limited
liability company

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
330 West Broadway
P. O. Box 128
San Diego, CA 92112-4104

**CASE NUMBER:**
*(Número del Caso):*
37-2014-00023031-CU-IC-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Timothy C. Earl SBN 174967          619.233.4100     619.231.4371
Sullivan Hill Lewin Rez & Engel
550 West C Street, Suite 1500
San Diego, CA 92101

DATE: JUL 14 2014        Clerk, by  A. Bennett  , Deputy
*(Fecha)*                *(Secretario)*              *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [x] on behalf of *(specify):* Insurance Company of the State of Pennsylvania, a Pennsylvania corporation
   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [x] by personal delivery on *(date):* 7/18/14

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465